Richard PAYNE, Winston Baylis, David Campbell, Own V. Gordon, Eric Heslop, Alfred Jarris, Seaton Messam, Leopold Smith, J. Soames, C. L. Wittingham and Derrick Williams, Plaintiffs,

v.

SS TROPIC BREEZE, her engines, boilers, furniture, apparel, appliances, appurtenances, equipment, etc., Defendant,

Tropical Commerce Corporation, Apostolos Samadjapolus, Intervenors.

Civ. No. 453–67.

United States District Court
D. Puerto Rico.

Sept. 28, 29, Oct. 2, 1967.

Nachman, Feldstein, Laffitte & Smith, Gustavo A. Gelpi, San Juan, P. R., for plaintiffs.

Fiddler, Gonzalez & Rodriguez, Roberto Córdova, McConnell, Valdes, Kelley & Sifre, Abelardo Ruiz Suria, O'Neill & Borges, Edward Borges, Hartzell, Fernandez & Novas, San Juan, P. R., for defendant and intervenors.

## ORDER

CANICO, Chief Judge.

Apostolos Samadjapolus, master of the SS Tropic Breeze, has petitioned leave of the Court to intervene and assert his claims for wages, travelling expenses and advance made on behalf of the vessel.

The Intervenor, National Western Life Insurance Co., has objected to the intervention of Apostolos Samadjapolus, alleging that under the American Maritime Law the master of a vessel has no lien for wages or travelling expenses. The master alleges that the law of the vessel's flag is controlling and that said law gives him a maritime lien for wages. The objection of National Western Life Insurance brings before the Court the issue of which law applies and whether under the applicable law the master has a lien for wages and travelling expenses. The parties have submitted briefs in support of their respective positions and due deliberation has been had.

*The Applicable Law*

I

In determining this threshold issue, the Court acknowledges the undisputable fact that the SS Tropic Breeze is a vessel of Liberian Registry and flies the flag of that country. Although the master was hired in New York, his contract of employment, that is, the Shipping Articles (Plaintiffs' Exhibit 3), call for the application of Liberian Law. Paragraph 16 of the Shipping Articles provides:

"16. All rights and obligations of the parties of these Articles shall be subject to the Laws and Regulations of the Republic of Liberia."

The right to wages arises out of the Articles and this Court is bound to apply the law which the parties contracted for, unless of course, the application of that law would contravene the laws or the public policy of the forum.

In the maritime field wages have long since been classified among those things better left to regulation by the nation of the vessel's flag, on the basis that to do otherwise would completely disrupt foreign commerce. Koukorinis v. S/T Eurypyle, 214 F.Supp. 344, 347 (E.D.Va.1963). The "settled American doctrine" regarding wages and other internal affairs of the vessel was stated by the Supreme Court in Lauritzen v. Larsen, 345 U.S. 571, at p. 585–586, 73 S.Ct. 921, at p. 930, 97 L.Ed. 1254:

"And so by comity it came to be generally understood among civilized nations that all matters of discipline, and all things done on board, which affect only the vessel, or those belonging to her, and did not involve the peace or dignity of the country, or the tranquility of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation, or the interest of its commerce should require."

American Courts have consistently enforced liens for wages in favor of a master when the laws of the vessel's flag gave the master such a lien. The Estrada Palma, 8 F.2d 103 (E.D. La.1923); The Yarmouth, 1923 A.M.C. 729 (S.D.N.Y.1923). Even when a state statute allows a lien maritime in nature, admiralty will enforce it. The J. E. Rumbell, 148 U.S. 1, 13 S.Ct. 498, 37 L.Ed. 345 (1893). Federal courts have also enforced wage liens in favor of masters when created by state statutes. The Edith, 217 F. 300 (D.C.Wash.1914); The Laurel, 113 F. 373 (D.C.Wash. 1902); Burdine v. Walden, 91 F.2d 321 (5th Cir. 1937). The statutory law of Puerto Rico grants the master such a lien, Title 10 App.L.P.R.A. § 562(6), 566, and this court has enforced it. Prentice v. The Verita, Adm. 1–59, U.S. District Court for the District of Puerto Rico (unreported). The Court can find no impediment in the American Admiralty and Maritime Law to deprive the master of a lien for wages given by the law of the vessel's flag.

In view of the foregoing the Court holds that the Law of the Republic of Liberia is applicable.

*The Law of Liberia Recognizes*
*A Lien For Wages In Favor*
*Of The Master*

II

Prior to August 18, 1964, the law of Liberia did not give the master of a vessel the protection regarding wages afforded to the crew. Thus, in The Arie H, 1963 A.M.C. 1595 (D.C.Ga. 1963), the master of a Liberian vessel was denied a lien for wages. After that decision the law was amended in April 23, 1964, effective August 18, 1964, and Section 298 was added to Title 22 of the Liberian Code of Laws. Section 298 of Title 22 provides:

"Except as otherwise provided, the Master of a Liberian vessel shall have the same rights in respect to wages, maintenance and cure and repatriation as hereinafter provided in respect of seamen."

Under this section the master has the same rights regarding wages as the crew and among those rights include a lien

for wages. Section 336(4) of Title 22 of the Liberian Code of Laws reads as follows:

"Section (4)—The seamen shall have a maritime lien against the vessel for any wages due him under this section."

The wage lien is so jealously guarded by the Liberian Law that an absolute prohibition against agreement forfeiting said lien is established in Title 22, Section 334 of the Liberian Code of Laws.

"No seamen shall by any agreement forfeit his lien upon the ship or be deprived of any remedy for the recovery of wages to which he should otherwise have been entitled; and every stipulation by which any seamen consents to abandon his rights to his wages in the case of the loss of a ship or to abandon any right which he may have obtained in the nature of salvage shall be wholly void and inoperative."

Finally, the wage lien is recognized to have the highest priority by section 113 of Title 22 of the Liberian Code of Laws.

The Liberian law recognizes that the master has a lien for his wages and this Court must enforce it in accordance with the doctrine stated in Lauritzen v. Larsen, supra.

### The Master's Lien For Travel Expenses

### III

■ National Western also objects to the master's intervention as regards his claims for travelling expenses allegedly incurred on behalf of the vessel, on the basis that such expenses do not create a lien upon the vessel.

The Court finds that the master travelled to New York for the purpose of seeking the necessary funds to pay the crew, Puerto Rico Drydock and other expenses. Because ship had no funds, the master had to pay for the travelling expenses out of his personal funds. The purpose of his trip was to obtain funds, which were to meet certain operational expenses of the vessel. His failure to travel would have been a violation of the duties imposed on a master by the Liberian law in Section 296 of Title 22 of the Liberian Code of Laws.

"(d) to assume full responsibility for the safety of the members of the crew."

"(f) to assume full responsibility for the vessel's funds and the disbursements thereof."

■ The success or lack of success is not the determinative factor. Travelling expenses have been recognized as constituting a lien upon the vessel. In The Egeria, 294 F. 791, 794 (9th Cir. 1924) the court upheld the allowance by the District Court of a lien for travelling expenses from Portland to San Pedro for the purpose of obtaining funds to release the vessel. In The Ascutney, 278 F. 991, 992–993 (D.C.Maryland 1922) the court allowed the master's taxi expenses even though he could have used a streetcar; and in The Artemis, 53 F.2d 672, 676 (S.D.N.Y.1931), taxi cab fare for conveying provisions to the crew were allowed. This court will also allow the travelling expenses incurred by the master when attempting to obtain funds to pay the crews' wages.

No objection has been interposed to any of the other claims in the master's intervening complaint.

In view of the foregoing the opposition of National Western is denied and the Motion for Leave to Intervene of Apostolos Samadjapolus is hereby granted.

### ORDER FOR THE SALE OF THE SS TROPIC BREEZE

The defendant vessel has been adjudged in default. The plaintiffs have petitioned the Court, pursuant to Rule E(9) (6) of the Supplementary Rules for Certain Admiralty and Maritime Claims to order the sale of the vessel, alleging that the custodia legis expenses were increasing and if allowed to continue indefinitely, would probably absorb the proceeds of the sale. Puerto Rico Drydock and Marine Terminals, Inc., the custodian appointed by order of the Court, has filed a Statement of

Expenses, from July 3, 1967 to September 8, 1967, showing the total expenses as of that date to be $8,195.31. Said custodian also filed a schedule of the estimated daily expenses of custodia legis. All the appearing parties agree on the necessity of having the vessel sold within the shortest time possible in order to minimize the custodia legis expenses. The court would have no hesitancy about ordering the sale were it not for the objection of the Intervenor, Tropical Commerce Corp. to the sale unless it were subject to reservation of Tropical Commerce Corp.'s alleged title in certain equipment installed aboard ship, fuel oil and cargo still on board the vessel. The plaintiffs and the other intervenor's opposed the sale subject to any reservation of title as suggested, and, instead, contend that the property claimed by Tropical Commerce Corp. is part of the vessel and subject to their maritime liens for wages, repairs and for foreclosure of a preferred ships mortgage. Thus, they are asking for the sale of the vessel together with the property presumably [1] belonging to Tropical and without any reservation of title.

Tropical Commerce Corp. has advised the Court that it no longer seeks the removal of said property and that it does not oppose the order of sale. Its position now is that the judicial sale can not validly convey title of the property to the purchaser of the vessel. This new attitude assumed by Tropical Commerce Corp. hardly differs from that requesting removal, for in either case, the Court must ultimately determine whether the equipment is part of the vessel and liable to the maritime lienors. If it is, then neither removal nor reservation of title can be allowed. Therefore, the issue before the Court is whether the property allegedly belonging to Tropical Commerce Corp., the fuel oil and cargo on board the SS Tropic Breeze must respond for the maritime liens of plaintiffs and other intervenors. In deciding the issue a review of certain facts is necessary.

### The Cement Equipment

#### I

Tropical Commerce Corp. had time-chartered the SS Tropic Breeze for a period of 30 months, with an option to purchase the vessel at the expiration of the term; pursuant to the charter party, the owner allowed the charterer the privilege of installing on board certain cement loading bagging and discharging equipment.[2] By virtue of clause 34, the owner recognized that the "equipment shall always remain the property of the charterers"; only on condition that "on redelivery of the vessel to the Owners, Charterers to make the necessary restorations resulting directly from the installation of this equipment". If the controversy were exclusively between the owner and the charterer, the latter would have an absolute right to this equipment, provided of course the necessary restorations were made. However, the controversy here is between the charterer and the maritime lienors.[3]

The court has heard substantial testimony and has had the benefit of visually inspecting the vessel and the cement equipment, which consists of a bagging apparatus, generators, central control system, heavy rubber conduits and movable suction pumps. The largest part, the bagging apparatus, is welded, riveted and bolted to the aft hold and extends upward to a height of over 25 feet. The operating energy is provided by generators and the central control system located in another compartment. The bases are welded and bolted to the deck of that compartment. Heavy insulated cables that cut through the bulkhead

---

1. For the purposes of this issue, the parties have filed their respective briefs assuming (but not accepting) that the property involved is legally owned by Tropical. The Court does not reach the question of legal title.

2. Charter Party between Southern Seas Shipping Corp. and Tropical Commerce Corp. (Tropical's Exhibit #1).

3. The various lienors are claiming wages, repair and supplies, advances and cargo damage.

connect the control system to the bagging apparatus. Numerous conduits extend from the bagging apparatus into the various holds, where the pumps to suction the bulk cement are attached. The equipment has no name-plate, property tag, marking, engraving, painting or other notice to indicate ownership by Tropical Commerce Corp. It was installed between June and August of 1966. The installation costs were over $138,400. To remove it today, although not impossible, would be a costly operation, the estimates in the record ranging between $25,000 and $100,000.

This equipment, although not required nor useful in the navigation of the vessel, has nevertheless completely transformed her from a dry cargo carrier into a bulk cement carrier. Without this equipment, her purpose or voyage, i. e., the transportation of bulk cement, could not be accomplished. The Witch Queen, D.C., Fed.Cas.No.17,916. In The Frolic, 148 F. 921, at p. 922 (D.C.R.I.1906), the Court held:

> "But where such instruments are supplied on account of the owners of a vessel, as a necessary part of her equipment for a special service, then it seems to me that they should be regarded as appurtenant to the ship, and as included in the term 'ship' or 'vessel.'"

Thus, the cement equipment is appurtenant, necessary and indispensable to the vessel's operation and trade as a bulk cement carrier. The vessel is unique and its value to a potential purchaser is, in great measure, this uniqueness.

■■ The fact that the property is owned by the charterer and not the shipowner does not prevent maritime liens from attaching. As Judge Dooling recognized in United States v. F/V Golden Dawn, D.C., 222 F.Supp. 186, at page 188:

> "It may be that the 'preferred maritime liens' of 46 U.S.C.A. § 953, or some of them, attach even to leased equipment; they enjoy something more than or, rather, different from

bare priority of rank and derivation from the general-owner interest; their origin (See, e. g. The Rebecca, D.C. Me.1831, 20 Fed.Cas. 373 (No. 11,619) and see on notice particular, pp. 381–382, cf. The Philomena, D.C.Mass. 1911, 200 F. 859, 861) makes it unsurprising that they tend toward reaching every sort of interest in the congeries of vessel, tackle, apparel, and furniture that has been committed to the hazard of the vessel's voyages and enterprise without regard to ownership and subdivisions of ownership interests." (citations omitted)

The charterer's equipment was also committed to the hazard of the voyage and enterprise and, consequently, is subject to maritime liens regardless of ownership and subdivisions of ownership interests.

This rule is not an innovation of the court. In The Hope, 191 F. 243 (D.C. Mass., 1911) an engine and a net fixed to the hull of the vessel were held to be parts of the boat for the purposes of satisfying a supplier's lien, even though owned by a third party. In The Paraiso, 226 F. 966 (W.D.Wash.1915) oil tanks belonging to the charterer were held to be a part of the vessel in a limitation proceeding. In The Augusta, 15 F.2d 727 (E.D.La.1920), wireless equipment, rented to the ship under a license agreement, was held to be part of her equipment and subject to a lien for collision damages. The same result was reached in The Katherine, 15 F.2d 387 (E.D.La. 1926) where the radio equipment was installed under a chattel mortgage. In The Showboat, 47 F.2d 286 (D.C.Mass. 1930), leased fire extinguishers were held to be subject to a maritime lien. The court in First Suffolk National Bank of Huntington v. The Air Brant, 125 F. Supp. 709 (D.C., 1954), refused to allow the removal of loaned property and of that acquired under a conditional sale agreement, holding at p. 710 as follows:

> "This court is now asked by these two parties to be allowed to remove the

above-mentioned essential items of equipment from the vessel prior to the marshal's sale. The effect of this, if successful, would be to reduce materially the prospective bids of potential purchasers at the marshal's sale. In any event, all of the above items are essential to the navigation and operation of these vessels as fishing vessels, and being part of the res, are subject to process in rem regardless of title." (citations omitted)

More recently, in United States v. F/V Sylvester F. Whalen, 217 F.Supp. 916 (D. C.Maine S.D.1963) a group of maritime lienors successfully opposed the intervention of a lessor seeking reservation of title to a fathometer and radar leased for use in the vessel.

But the case most directly in point is Turner v. United States, 27 F.2d 134 (C. C.A.2 1928) where the facts considered by the court were analogous to those present before this Court, and where it is stated at page 135:

"The Zero was under time charter to the appellant for many years. She had been operated as a refrigerating vessel, and was engaged in carrying meat cargoes from South America to British ports. The refrigerating plant was installed in 1896, and remained in the vessel, until the time of collision in 1922. It consisted of refrigerating machines, pumps installation, pipe lines, and was physically attached to the vessel. Under the terms of the charter, the machinery and insulation were to remain the property of the charterer, and to be removed by it and the vessel restored to its original condition under (sic) the termination of the charter. It is obliged to share the losses, because the Zero was at fault, and the refrigerating system and the vessel are claimed to be one. Its value was wholly incident to the ship and for its use, and it was a necessary appurtenance to the ship's business."

The court, at page 136, went on to conclude that:

"The courts do not permit a division of the res when it is made answerable for torts committed by the vessel, and though there may be separate ownership of the refrigerating plant, as between the parties to the charter, it is a part of the vessel, to which those suffering damages are entitled to look for reimbursement for torts committed by the vessel."

That decision has been followed and recognized as the definitive expression of the applicable law.[4]

██ Although the lien in *Turner* arose out of a collision, while here the liens arise out of maritime contracts, there is no logical basis for drawing a distinction between different classes of lienors with respect to the appurtenances or properties aboard the vessel. The charterer here has asserted that the rule is applicable only in collision case. No reason has been presented for so limiting its application. At least some liens arising from maritime contracts such as liens for wages would appear to be entitled to greater protection than liens arising from maritime torts. In this case, where there has been no labeling, separation, identification, or other notice, the contract lienors were entitled to rely on the presence of the appurtenances or other property as ship's property when they contracted with the vessel. The tort lienor does not rely on a vessel's value since his lien usually results from a sudden occurrence with no prior notice.

██ There can be no question that insofar as the lien for wages of crewmen, the equipment should respond. According to Gilmore and Black, after custodia legis expenses are paid, claims by seamen for wages have the highest priority among maritime liens.[5] Since the equip-

4. First Suffolk National Bank of Huntington v. The Air Brant, supra, 125 F.Supp. at p. 710; United States v. F/V Sylvester F. Whalen, supra, 217 F.Supp. at p. 917; and United States v. F/V Golden Dawn, supra, 222 F.Supp. at page 189.

5. Gilmore and Black, The Law of Admiralty, 1937, Ed. at page 696.

ment in this case is not distinguishable from the case where it belonged to a lessor, bailor, chattel mortgagee or conditional sales vendor; and since the wage lien is of a higher priority than that of a collision victim, the Court cannot accept the suggested distinction.

The Court is aware of decisions [6] reaching apparent results different from the views expressed herein, but in each of these cases the facts and circumstances were distinguishable from the facts herein. To whatever extent the results therein may be in conflict with this opinion, this Court respectfully disagrees.

What has been said so far would ordinarily dispose of the controversy were it not for the charterer's allegation that the *Golden Dawn* [7] decision is a "binding precedent controlling the claim of the mortgagee, National Western Life Insurance Co., *vis a vis* the rights of Tropical."

■ The decision is highly persuasive and this Court would be inclined to follow it if presented with like facts and circumstances. But the facts are not apposite. For example, the lease in *Golden Dawn* was prior to the mortgage and the equipment lessor was very careful in attaching its name plate and property tag, which stated that even if the sounding equipment was a functionally integral part of the vessel, it was not subject to a mortgage. No such precaution was taken by Tropical Commerce Corp. nor did it obtain permission from the mortgagee prior to installing the equipment even though aware of the existence of the mortgage and of the terms thereof. The mortgage now held by National Western included:

"The whole of the vessel, together with all of the boilers, engines, machinery,

masts, spars, sails, rigging, boats anchors, chain, tackle, apparel, furniture, fittings and equipment and all other appurtenances thereto appertaining or belonging and appropriated to the exclusive use of the vessel, whether now owned or hereafter acquired, whether on board or not, and all additions, improvements and replacements hereinafter made in or to the Vessel (except leased equipment not belonging to the shipowner)." [8]

The cement equipment does not fall within the category excluded from the extent of the mortgage, and the holding of the *Golden Dawn* thus becomes inapplicable to the fact herein. The more analogous situation is presented in United States v. F/V Sylvester P. Whalen, supra, and this Court will follow Judge Gignoux's well reasoned opinion in denying the petition for reservation of title, even as against the mortgagee.

For the foregoing reasons the petition of Tropical Commerce Corp. to reserve title is hereby denied.

### THE FUEL OIL

#### II

When the SS Tropic Breeze arrived in San Juan, Puerto Rico, she was laden with approximately 150 tons of Bunker C. fuel oil, which Tropical Commerce Corp. claims it owns. Title is asserted under the provisions of the charter party by which the charterer was required to pay for all the fuel consumed by the vessel. The charterer requests that the sale be made with notice of its right to title to the fuel oil. All plaintiffs and most intervenors have opposed, claiming that their liens extend to the fuel oil.

■ Assuming, once again, that Tropical Commerce Corp. is the legal

---

6. The Merrimac, 29 F. 157 (D.C.Mass. 1888); The Hirondella, 21 F.Supp. 223 (S.D.Ala.1937); Learned v. Brown, 94 F. 876, (5th Cir. 1899); The Showboat, 47 F.2d 296 (D.C.Mass.1930); National Bank of Commerce v. The John T., 1949 A.M.C. 328 (D.C.Wash.1947); San Diego Trust & Savings Bank v. Linda Lee, 1949 A.M.C. 324 (S.D.Cal.1947).

7. United States v. F/V Golden Dawn, supra.

8. First Preferred Ship Mortgage, April 20, 1966, page 2. (National Western Life Insurance Co., Intervening Complaint, Exhibit 1.)

owner of the fuel oil, the Court, nevertheless, finds that the fuel oil is part of the vessel, its tackle, boilers, engines, etc. Without it, the vessel cannot move and, consequently, it becomes necessary and indispensable to the vessels navigation. In Moore v. Martine Marine Transp. Co., 177 F.2d 561, 563 (4th Cir. 1949) the Court of Appeals upheld the District Courts conclusion that:

"1. The bunker fuel oil laden aboard the Steam Tug P. F. Martin at the time she was sold by the United States Marshal for the Eastern District of Virginia constituted a part of said vessel, its tackle, apparel, furniture, etc."

That conclusion was affirmed on authority of The Augusta, supra, The Katherine, supra and Turner v. United States, supra. In view of the foregoing the petition of Tropical Commerce Corp. to reserve title to the fuel oil is denied.

### THE CARGO

### III

 Tropical Commerce Corp. also wants the vessel sold subject to its rights and title in the cargo aboard the SS Tropic Breeze, consisting of approximately 416 tons of dry Portland cement in bulk and approximately 20,000 bags. The other parties in this action admit that cargo is generally not subject to maritime liens, Clifford v. Merrit, Chapman & Scott Corp., 57 F.2d 1021 (5th Cir. 1932); Sheppard v. Taylor, 5 Peters 675, 8 L.Ed. 269 (1831). However, a further hearing must be held to determine whether the charterer owes freight or charter hire, as claimed by the plaintiffs, because if charter hire or freight is owed to the shipowner, the wage claim lienors may proceed against the cargo or the proceeds of the sale of the cargo. Clifford v. Merrit, Chapman & Scott Corp., supra; Poland v. The Spartan, 134 Fed.Cas.No. 11246, p. 912.

To preserve the rights of all parties, the Court orders that the sale of the cargo shall be separate from the sale of the vessel and its appurtenances, and the proceeds of the sale of the cargo shall be deposited in the Registry of the Court in a separate fund. The notice of sale shall provide for this separate sale of the cargo with the offloading thereof to be at the expense of the purchaser.

### IV

The following shall be

### THE FORM OF THE ORDER OF SALE

1. The vessel shall be sold together with the cement equipment and the fuel oil but without the cargo.

2. (a) The notice of sale shall inform the prospective purchasers that the vessel includes the cement equipment and fuel oil and that the purchaser will acquire title to the vessel, equipment and fuel oil, free and clear of any liens, mortgages, or claims of any person.

(b) The notice of sale shall also advertise a separate sale of the cargo of bulk cement and bags with the cost of removal of the cargo to be borne by the purchaser thereof.

3. The notice of sale shall be published in a newspaper of general circulation within this District, at least four times during the fifteen days preceding the sale. The notice shall specify the date, time and place where bids shall be received. Any party may, at its own expense, publish the notice of sale in any newspapers or other news media, outside the District, provided said notice conforms with this Order.

4. The sale shall be conducted by the United States Marshal for the District of Puerto Rico at his office in San Juan, Puerto Rico, on the 17th day of October, 1967, at 2:00 o'clock in the afternoon of said date.

5. The vessel shall be sold to the highest bidder for cash or certified check subject to the approval of the Court.

6. The cargo shall be sold to the highest bidder for cash or certified check, subject to the purchaser's removal of the cargo within one week from the sale, unless the purchaser of the cargo is the same entity or person that purchases the

vessel. Failure to remove the cargo within the period specified shall operate as a forfeit of his purchase price.

It is so ordered.

### ORDER

The plaintiffs, Richard A. Payne, et al., are claiming statutory wages under section 596 of Title of U.S.C.A.[1] The Intervenor, Tropical Commerce Corporation, has objected to the seamen's claim for double wages. No other intervenor has filed any memorandum, in opposition to the seamen's claim. A brief recital of the facts must be made before reaching the legal question.

The SS Tropic Breeze, a vessel flying the flag of the Republic of Liberia, arrived in Puerto Rico on or about June 26, 1967, for the purpose of undergoing routine drydocking repairs pursuant to the owner's instructions. Some days after arriving in San Juan the seamen in accordance with the terms of their contract of employment[2], demanded of the master their wages due, which at that time, according to him, amounted to less than $1500, excluding the wages of two engineers who had not been paid for the previous two months in order to build a reserve or savings. The master did not have the funds to meet this demand so he telephoned the owner's agent, Northwestern Agencies, Ltd., which operated the vessel. He talked with the manager, Mr. Skourles, who after being advised of the crew's demand and the lack of food, promised to send the necessary funds immediately. When these did not arrive the master tried to have Tropical Commerce Corporation, the charterer, advance the funds but had no success. At last he went to New York to obtain the money, but was only able to obtain more promises.

In the meantime the crew was without food or money. After four days of involuntary abstinence and with no relief in sight, they sought the services of counsel, who on July 3rd filed a complaint and caused the vessel to be arrested. Arrangements were made with the Salvation Army, whose officers assumed the neglectful shipowner's duty of providing the crew with food. Despite the master's efforts the plaintiffs' wages still remain unpaid. The shipowner has failed to claim the vessel or answer the complaint and default has been entered.

▮ The court finds that on June 30, 1967, upon the owner's failure to pay the wages due, the contract of employment was breached and the seamen were entitled to be paid off in full and repatriated to their country of origin.[3] Whether statutory penalties will be awarded by a Court in a situation such as the present one depends upon the circumstances for withholding the payment of the wages due.

Section 596 of Title 46 U.S.C.A. requires that there be a *refusal* or *neglect* and that it be *without sufficient cause*. The evidence and testimony before the Court shows that payment of the wages was refused or neglected within the meaning of the statute. The only question for determination by this Court is whether the refusal or neglect was without sufficient cause.

▮ The term "without sufficient cause" has been defined by the Supreme Court of the United States in Collie v. Fergusson, 281 U.S. 52, 56, 50 S.Ct. 189, 191, 74 L.Ed. 696 (1930) as follows:

"The words 'refuses or neglects to make payment * * * without sufficient cause' connote, either conduct which is in some sense arbitrary or

1. The pertinent text of 46 U.S.C.A. § 596 reads: "Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable

as wages in any claim made before the court."

2. Articles of Agreement Between the Master and Seamen in the Merchant Service of the Republic of Liberia: (Plaintiffs exhibit #3) Paragraphs 2, 3, 5 and 6.

3. See, Note 2, supra.

willful, or at least a failure not attributable to impossibility of payment. We think the use of this language indicates a purpose to protect seamen from delayed payments of wages by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible. Hence we conclude that the liability is not imposed regardless of the fault of the master or the owner, or his retention of any interest on the vessel from which payment could be made. It can afford no such protection and exert no effective coercive force where delay in payment, as here, *is due to the insolvency of the owner and the arrest of the vessel, subject to accrued claims beyond its value.* Together these obstacles to payment of wages must be taken to be sufficient cause to relieve from the statutory liability. The Trader, supra; Feldman v. American Palestine Line, Inc. (D.C.) 25 F.2d 1002. Cf. Gerber v. Spencer, supra." (emphasis added)

It is apparent that if at the time the demand is made the owner is insolvent and the vessel subject to accrued claims beyond its value, the owner or fund, is relieved from the statutory liability. Conversely, if when demand is made the owner is solvent and the value of the vessel exceeds the accrued claims, the seamen are entitled to penalties.

The meaning of the term insolvency may have different meanings in different contexts, but for the purpose of this case, the definition given in *Collie* is the only one pertinent.

The facts present in *Collie* supported a finding that the owner was insolvent. The vessel was libeled for repairs. At the time of the seizure only two men were employed on board and their employment terminated when the vessel was seized. The other wage claimant had consented to the deferred payment because of the owner's financial situation. Because all the accrued claims exceeded the value of the vessel and since the owner was in

effect insolvent, the Supreme Court was reluctant to award statutory extra wages.

The *Collie* decision and the cases cited therein for holding that insolvency was sufficient cause to excuse payment, presented facts and circumstances quite different from the case at bar. In The Trader, 17 F.2d 623, 626 (E.D.S.C.1926) the Court found that the corporation was "absolutely insolvent" and that when wages were demanded the situation was completely hopeless because the amount of claims surpassed the value of the vessel. The Court also found that "all efforts to obtain funds were exhausted." In Feldman v. American Palestine Line, Inc., 25 F.2d 1002, 1003, (S.D.N.Y.1926) the wages could not be paid because the corporation and the vessel were taken over by a receiver in equity appointed by the Court. In The Acropolis, 8 F.2d 110 (E.D.N.Y.1923) a petition in bankruptcy was filed against the owner and a receiver appointed, consequently he could not use available funds to pay wages.

On the other hand, in Gerber v. Spencer, 278 F. 886, 890 (9th Cir. 1922) the Court held that financial difficulties of the shipowner "did not relieve it from an obligation with respect to claim for wages, including extra pay". This holding was accepted by the Court in The Trader, supra, where it was said:

"In this I am inclined to agree with them, and, if this case presented merely a question of financial difficulties, I should be disposed to allow the double wages. It is the duty of the master or owner to take steps to insure the prompt payment of wages, and, if financial difficulties were allowed to be a sufficient excuse, it would in many cases practically take away from the seamen their rights under the statute." (17 F.2d at p. 626)

In the case at bar the evidence neither supports the conclusion that the owner was insolvent nor does it support a finding that at the time demand for wages was made the accrued claims surpassed the value of the vessel. The pleadings, documents and testimony before the court indicate that at the time of demand,

the wages due were the only accrued claim. Some time thereafter, other claims against the vessel matured, but such claims cannot be retroactively applied to excuse payment of wages when due. Even at this stage of the proceedings there is no evidence of insolvency, nor that the accrued claims exceed the value of the vessel and even if there were such evidence it would not preclude this Court from awarding penalties. Peterson v. S.S. Wahcondah, 331 F.2d 44, 47–49 (5th Cir. 1964); on remand, 235 F. Supp. 698 (E.D.La.1964).

 The evidence does not suggest the possibility that the owner may have been in financial difficulties[4]; although, not even this situation constitutes sufficient cause to excuse payment. Gerber v. Spencer, supra. If mere financial difficulties were allowed to be sufficient excuse, it would in many cases practically take away from the seamen their rights under the statute. The Trader, supra; The Chester, 25 F.2d 908, 910 (D.C.Maryland 1928). In the absence of evidence this Court cannot conclude that the shipowner was in financial difficulties. The Great Canton, 299 F. 953 (E.D.N.Y.1924).

 Tropical Commerce Corp. argues that default of the shipowner is equivalent to insolvency. This novel presumption unsupported by any authoritative decisions, would place the burden of overcoming the presumption upon the plaintiffs. Such a proposition is foreign to the American system of law and this Court will not tolerate a rule that would require the plaintiffs to prove that the shipowner was not insolvent. The burden of establishing this defense is on the party alleging it, Butler v. United States War Shipping Administration, 68 F. Supp. 411 (D.C.Pa.1946); and, in the absence of a positive showing by said party, this Court concludes, on the evidence in this case, that the refusal to

pay wages was "without sufficient cause."

Congress has seen fit to provide a penalty in favor of seamen whose wages are withheld without sufficient cause. This Court finds that the plaintiffs' wages were withheld without sufficient cause and it must enforce the Congressional mandate.

In view of the foregoing the penalty wages provided by 46 U.S.C.A. § 596, are allowed and shall be computed from plaintiffs' Exhibit 3 and 4 and the testimony of the master.

It is so ordered.

---

4. Clause 4 of time charter agreement, submitted in evidence by Tropical Commerce Corp. (Tropical's Exhibit #1), shows that the charterer was required to pay for the use and hire of said vessel at the rate of $17,500.00 (U. S. currency) per Calendar Month. If no charter hire is owed in accordance with Clause 4, then there was no excuse for failing to pay the wages due.