In re Hilman **LOGAN**, Logan Towing Service, Inc., Logan Transportation, Inc., Logan Charter Service, Inc., Logan & Hazzard Towing Service, Inc.

**HIBERNIA NATIONAL BANK IN NEW ORLEANS, Claimant,**

v.

Hilman **LOGAN**, Logan Towing Service, Inc., Logan Transportation, Inc., Logan Charter Service, Inc., and Logan & Hazzard Towing Service, Inc., Debtors.

**Bankruptcy No. E85–40163.**

United States Bankruptcy Court, N.D. Mississippi.

Jan. 22, 1986.

er, it is not discharged simply because it is a post-petition debt. 11 U.S.C. §§ 523 and 727.

**902**

James W. Newman, III, Harold J. Bark-
ley, Jackson, Miss., for Hilman Logan, et
al.

Joseph N. Mole, Lemle, Kelleher, Kohl-
meyer, Hunley, Moss & Frilot, New Or-
leans, La. and W. Wayne Drinkwater,
Lake, Tindall, Hunger & Thackston, Green-
ville, Miss., for Hibernia Nat. Bank in New
Orleans.

Douglas J. Smith, Jr., Robertshaw, Ter-
ney & Noble, Greenville, Miss., for Brent
Towing Co., Inc. and Brent Marine Supply,
Inc.

Harris P. Quinn, Heiskell, Donelson,
Bearman, Adams, Williams & Kirsch, Mem-
phis, Tenn., for First Tennessee Bank Nat.
Ass'n.

Douglas C. Wynn, Wynn & Mitchell,
Greenville, Miss., for Unsecured Creditors
Committee.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy
Judge.

By agreement of all parties, this proceed-
ing is before the Court on the claim of
Hibernia National Bank in New Orleans,
hereinafter referred to as Hibernia, to the
proceeds of a sale of 91,685 gallons of fuel
formerly aboard the M/V UNITED
STATES; said claim being disputed by the
above captioned Debtors and the Debtors'
unsecured creditors committee; all of said
parties having consented that this Court
could enter a final order resolving the
claim dispute based on the pleadings and
discovery on file, as well as, on the submis-
sion of respective memoranda of law; and
the Court having considered same, finds as
follows, to-wit:

## I.

This Court has jurisdiction of the subject
matter of and the parties to this proceeding
pursuant to 28 U.S.C. § 1334 and 28 U.S.C.
§ 157. Although this matter might be de-
fined as a core proceeding pursuant to 28
U.S.C. § 157(b)(2)(A), (B), (E), or (K), the
parties have all consented that this Court
may enter a final order in this proceeding,
subject to the appeal provisions of 28
U.S.C. § 158.

## II.

Hibernia was the holder of a first pre-
ferred fleet mortgage, hereinafter referred
to as ship mortgage or mortgage, encum-
bering two towboats, the M/V UNITED
STATES and the M/V AMERICA. The
mortgage was granted by the owner of
said vessels, Logan Towing Company, Inc.,
hereinafter referred to as Logan Towing,
as security for a $3,400,000.00, loan trans-
action. This debt was guaranteed by Lo-
gan Charter Service, Inc., hereinafter re-
ferred to as Logan Charter, and Hilman
Logan, individually, hereinafter referred to
as Logan. An in rem admiralty foreclosure
action was commenced by Hibernia against
the two vessels, due to default under the
mortgage, in the United States District
Court for the Northern District of Missis-
sippi on June 26, 1984. Thereafter, the
vessels were seized by the United States
Marshal, along with the equipment and
fuel on board. Pursuant to an order of the
District Court, dated November 5, 1984, the
vessels and fuel, amounting to approxi-
mately 91,685 gallons, were sold on Decem-
ber 10, 1984. The Debtors and Hibernia
agreed to permit an interlocutory sale of
the fuel, separate from the vessels, with
the proceeds from the sale to be deposited
into the registry of the District Court, re-
serving for later consideration whether
said fuel proceeds were subject to the ship
mortgage. At the sale, the vessels and
their equipment were sold to Hibernia for
$206,700.00. The fuel was purchased by
Brent Towing Company of Greenville, Mis-
sissippi, at a price of fifty-nine cents per
gallon, or a total sum of $54,094.15. The

sale of both the vessels and the fuel was confirmed by the District Court, and when the fuel was removed from the M/V UNITED STATES, which was the only vessel containing fuel, the sales proceeds were deposited into a federally insured interest bearing account. The two vessels were subsequently resold by Hibernia at private auction for a price of $230,875.00, and on June 25, 1985, the District Court entered summary judgment in favor of Hibernia against the Debtors in the amount of $3,637,594.66, which represented the loan deficiency following the resale of the vessels. On July 15, 1985, voluntary Chapter 11 bankruptcy petitions were filed on behalf of each of the Debtors. Although this proceeding was initially commenced with the filing of a motion seeking relief from the automatic stay, each of the parties agreed that this Court could decide the issue of whether the Hibernia mortgage encumbered the proceeds realized from the sale of the fuel, and as such, whether said proceeds should be paid over to Hibernia to be applied to the aforementioned deficiency. The Debtors' unsecured creditors committee was permitted to intervene in this proceeding pursuant to an order of this Court, dated October 16, 1985.

### III.

The first preferred fleet mortgage, securing the $3,400,000.00 loan, granted by Logan Towing to Hibernia on June 25, 1982, recites that it encumbers, "the whole of the Vessels together with all of the equipment, boilers, engines, machinery, masts, spars, rigging, boats, cables, motors, tools, anchors, chains, booms, cranes, rigs, pumps, pipe, tanks, tackle, apparel, furniture, supplies, fittings and equipment and all other appurtenances to the Vessels appertaining or belonging, whether now owned or hereafter acquired, whether on board or not, and all additions, improvements and replacements hereafter made in or to the Vessels." In order to properly decide whether the terms of this mortgage reach the proceeds from the sale of the fuel, the factual circumstances, recited above and immediately hereafter, were considered by the Court.

Logan Towing, the owner of the M/V UNITED STATES and the M/V AMERICA, had chartered the two vessels to Logan Charter, which served as an operating company. Logan Charter, in turn, chartered the vessels to Twin City Barge and Towing Company, Inc., hereinafter referred to as Twin City, which, according to the charter agreement, was responsible for providing the necessary fuel for the vessels' operation. Following an economic downturn, Twin City and Logan Charter, after consultations with Hibernia and First Tennessee Bank, negotiated a termination of their charter arrangement. By virtue of a letter agreement, dated April 26, 1984, executed by each of the aforementioned parties, the termination provisions were reduced to writing. (See Exhibit B appended to the Joint Memorandum of Debtors and the Debtors' Unsecured Creditors Committee.) In pertinent part this agreement provided the following:

TCB [Twin City] hereby agrees to make the following payments to Logan Charter Service, Inc. or to such other members of the Logan group as Hilman Logan may designate:

a. All fuel aboard the Vessels at April 1, 1984 (valued at approximately $350,000), free and clear of all liens and encumbrances. TCB will pay the balance due, if any, for all such fuel and will indemnify and hold Logan harmless from any claims for failure so to pay.

b. TCB's entire right, title, and interest in and to the M/V Blue Ridge, with TCB's full warranty of title but without any warranty as to fitness or seaworthiness.

c. $450,000 in cash by wire transfer. $300,000 will be so paid upon mutual execution of this letter agreement, $50,000 will be so paid 15 days after such execution, $50,000 will be so paid 30 days after such execution, and the $50,000 balance will be so paid 45 days after such execution.

d. 300,000 shares of common stock of Twin City Barge, Inc. TCB will cause all or any part of the 300,000 shares to be registered under the Securities Act of 1933, and if necessary, qualified under applicable Blue Sky Laws, in the event Logan so requests either in conjunction with issuance of the shares to Logan, or in conjunction with the resale of the shares by Logan, during the two years following issuance of the shares by TCB. Logan may so request only one Securities Act registration and Blue Sky Law qualification, and TCB may select the form of Securities Act registration (including, but not limited to, a Regulation A offering). The Securities Act registration and Blue Sky Law qualification will be at the sole expense of TCB, except that Logan will be responsible for any underwriting commissions, discounts, or similar fees.

The M/V UNITED STATES was the only vessel working under the Twin City charter at the time of the termination, and as such, was the only vessel containing fuel on board. At the time that the M/V UNITED STATES was surrendered to Logan Charter following the charter termination, it contained approximately 117,000 gallons of fuel. Between December 23, 1983, and the date of the seizure by the United States Marshal, approximately 23,000 gallons of this fuel were utilized by Logan Charter in furtherance of its business operations. (See the affidavit of Hilman Logan, attached as Exhibit C, to the Joint Memorandum of the Debtors and the Debtors' Unsecured Creditors Committee.)

In June, 1982, when Logan Towing executed the ship mortgage in favor of Hibernia, as additional security, Hibernia obtained the guarantees of both Hilman Logan and Logan Charter for the repayment of the loan, as well as, an assignment of the charter agreement between Logan Charter and Twin City. (See Exhibits A, B, and C appended to Hibernia's Rebuttal Memorandum.) As such, all of Logan Charter's interest in the Twin City charter agreement was assigned to Hibernia, including: "The right to receive all monies due and to become due under, and the right to compel payment of hire and other monies due under the charters, including, without limitation, all freight, hire earnings, and charter payments and *all claims for damages arising out of the breach or termination thereof.*" Exhibit C, p. 2 [emphasis added]

## IV.

There are two independent issues which are critical to this proceeding: (1) Whether the Hibernia mortgage encumbers the fuel proceeds; and (2) Regardless of the extent of coverage of the mortgage, whether the assignment of the charter agreement by Logan Charter to Hibernia, in and of itself, conveys the right to the fuel proceeds to Hibernia. Although it is not absolutely necessary, which will become obvious following a complete reading of this opinion, both of these issues will be discussed.

In their respective memoranda of law, both sides attempted to draw support from the *SS Tropic Breeze* cases, i.e., *Payne v. SS Tropic Breeze,* 274 F.Supp. 324 (D.P.R.—1967); *Payne v. SS Tropic Breeze,* 412 F.2d 707 (1st Cir.—1969); and *In Re: SS Tropic Breeze,* 456 F.2d 137 (1st Cir.—1972). In actuality, these three cases are not at all dispositive of the critical admiralty issue before this Court, i.e., whether the Hibernia mortgage encumbers the fuel proceeds, but only provide modest insight regarding certain peripheral questions. In the first *SS Tropic Breeze* case, the District Court for the District of Puerto Rico held that cement equipment and fuel, installed on the vessel by the charterer, Tropical Commerce Corp., transforming the vessel, a dry cargo carrier into a bulk cement carrier, had been committed to the hazards of the voyage and enterprise, and as such, were subject to maritime liens for wages, and repairs, as well as, the foreclosure of a preferred ship mortgage, regardless of the ownership of the property so installed.

Specifically concerning the fuel, the Court found that the fuel was a part of the vessel, its tackle, boilers, engines, etc., without which, the vessel could not move. The Court stated that the fuel was necessary and indispensable to the vessel's navigation, quoting *Moore v. Martin Marine Transp. Co.*, 177 F.2d 561 (4th Cir.—1949), as follows:

1. The bunker fuel oil laden aboard the steam tug P.F. Martin at the time she was sold by the United States Marshal for the Eastern District of Virginia constituted a part of said vessel, its tackle, apparel, furniture, etc.

*Payne v. SS Tropic Breeze*, 274 F.Supp. 324, 333.

When this decision was appealed to the First Circuit Court of Appeals, several interesting things occurred. The First Circuit, concurring with the District Court in its conclusion that the equipment and fuel were appurtenances to the vessel, stated the following:

A mortgage may properly attach to the property of others which has become an appurtenance to the ship conveyed. See *United States v. F/V Sylvester F. Whalen*, D.Me., 1963, 217 F.Supp. 916; *First Suffolk Nat'l Bank of Huntington v. The Air Brant*, E.D.N.Y., 1954, 125 F.Supp. 709. . . .

*Payne v. SS Tropic Breeze*, 412 F.2d 707, 708–09.

However, the First Circuit, without explanation, considered the fuel oil to be synonymous with the equipment:

. . . Accordingly, we decide only one issue, whether under the mortgage the mortgagee had an interest in the equipment (that term hereinafter to include the fuel oil) superior to (and hence in this case, to the exclusion of) the interest of Tropical [footnote omitted] . . .

*Id.* at 708.

The First Circuit then reversed the decision of the District Court as to the *ship mortgage* encumbering the equipment (which now, as appropriately set forth in the Debtors', etc., Joint Memorandum, included the fuel), on the basis that *the mortgagee was on notice* that its mortgagor (the shipowner) would acquire no interest in the equipment. The following quotations provide the rationale for the reversal:

. . . However, in this case the mortgagee took the mortgage *with full knowledge of the charter, and hence of the fact that the shipowner would acquire no interest in the equipment.* See United States v. F/V Golden Dawn, E.D.N.Y., 1963, 222 F.Supp. 186. Nor did Tropical join in the mortgage. the mortgagee's present insistence with respect to its claim of having acquired a lien on the equipment, that it is an 'innocent third party,' is therefore not accurate. It has long been the law that a subsequent mortgagee *having notice of the reservation* acquires no greater rights than were possessed by the mortgagor. [citations omitted] In the present instance the mortgagee *had full notice* of the prospective reservation of title in Tropical. The fact that the property was not physically attached until after the mortgage was entered into is not significant, *given the notice of reservation. . . .* [emphasis added]

Nor is this all. The mortgage itself expressly provided that property in which the mortgagor's interest was only as lessee did not pass to the mortgagee even though, legally, it became an appurtenance to the vessel. The mortgagee seeks to distinguish this provision by saying that it applies only to equipment acquired by lease, but not to property attached by a charterer of the vessel. We are not impressed by this distinction. . . .

*Id.* at 709.

This opinion from the First Circuit dealt only with the ship mortgage, and not the preferred maritime liens, several of which had been interposed against the vessel, equipment, and fuel. The distinction between these two liens will be discussed hereinbelow in the review of a second decision in this case rendered by the First Circuit. However, prior to leaving this opinion, this Court is somewhat puzzled

why the First Circuit catagorized the fuel and the equipment together. It is not uncommon for a charterer to be responsible for the purchase of fuel to be utilized in the operation of a vessel. Such is the case now before this Court in that all fuel purchased was for the account of Twin City. (See Exhibit A, page 4, Fully Found Charter Agreement, attached to Debtors and Debtors' Unsecured Creditors Committee Joint Memorandum.) On the other hand, regarding the SS Tropic Breeze, the installation of the cement equipment, the notice of which was charged to the ship mortgagee, was a major undertaking of unusual proportion. The vessel was completely transformed from a dry cargo carrier into a bulk cement carrier through the installation of cement loading, bagging, and discharging equipment. The significance of this transformation is acknowledged in the District Court opinion which indicated that the installation costs alone were over $138,-400.00. (See Payne v. SS Tropic Breeze, 274 F.Supp. 324, 330.) It is understandable why the mortgagee should be charged with notice of a modification to the vessel of this magnitude. Since the reversal of the District Court decision turned on the mortgagee's knowledge of the equipment installation, it would have been helpful to have had an explanation as to why the fuel was considered in the same context as the equipment. Because of this categorization, this second SS Tropic Breeze opinion provides little, if nothing, of significance that is helpful in resolving the issues before this Court.

Having found that the preferred ship mortgage did not extend to the equipment and fuel, the First Circuit in yet another opinion, In Re: SS Tropic Breeze, 456 F.2d 137 (1st Cir.—1972), delineated the distinction between a ship mortgage and preferred maritime liens, to-wit:

> The traditional admiralty rule is that the vessel itself and all equipment which is 'an integral part of the vessel and [is] essential to its navigation and operation,' are subject to preferred maritime liens on the vessel [citations omitted]. ... The cement equipment [including the fuel] in-

volved in this case is clearly of the type that is subject to such claims. The TROPIC BREEZE became, with the installation of the equipment, a bulk cement carrier. The equipment was essential to its operation as such a carrier. It could not be removed without substantial cost, and the value of the ship would be substantially less without it. [footnote omitted] The fact that the equipment was owned by Tropical, a time charterer, does not change the result. [citations omitted]

Id. at 141.

This decision held that the preferred maritime liens, extended to the installed equipment, as well as, the fuel, although no mention was made of the fuel per se. This, of course, is a departure from the earlier First Circuit opinion which refused to extend the lien of the ship mortgage to the equipment and fuel. The basic reason for the distinction between the preferred maritime liens and the ship mortgage is codified in 46 U.S.C. § 953, as follows:

> § 953. Preferred maritime lien; priorities; other liens
>
> (a) When used hereinafter in this chapter, the term 'preferred maritime lien' means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for wages of the crew of the vessel, for general average, and for salvage, including contract salvage.
>
> (b) Upon the sale of any mortgaged vessel by order of a district court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all preexisting claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of section 952 of this title, shall be held terminated and shall thereafter attach, in like amount and in accordance with their

respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court.

The First Circuit cited *U.S. v. F/V Golden Dawn*, 222 F.Supp. 186 (E.D.N.Y.—1963), which had earlier held that a preferred maritime lien extended further than a preferred ship mortgage, reasoning that the ship mortgage remained basically a security instrument pledging the mortgagor's interest of ownership for the payment of his debts and not those of the ship's, i.e., seamen's wage claims, tort claims, etc.

In *F/V Golden Dawn*, the court held that sounding equipment, which was leased by the manufacturer to the owner of the vessel and which was removable without damage to the vessel, *was not* part of the vessel, her tackle, apparel, and furniture, and as such, *was not* subject to the Government's preferred ship mortgage. This reasoning distinguishes *F/V Golden Dawn* from the *SS Tropic Breeze* decisions, and as such, from the case now before this Court, inasmuch as fuel is considered in all of the reported cases to be a part of and an appurtenance to the vessel.

The court in *F/V Golden Dawn*, much like the initial opinion of the First Circuit in *SS Tropic Breeze*, emphasized that the ship mortgagee was on notice that the sounding equipment was not the property of the ship owner, but was obviously the property of the lessor, which had clearly marked the property, "Property of Raytheon Company. Not to be sold or moved."

Since we obviously do not have the issue of the extent of coverage of a preferred maritime lien before this Court, only that of a preferred ship mortgage, the second First Circuit decision in the *SS Tropic Breeze* trilogy provides limited assistance to this Court in that it accurately and correctly distinguishes the effects of the two liens. The only other discernible benefit of the *SS Tropic Breeze* decisions is that found in the original District Court opinion which classified the vessel's fuel as being an appurtenance of the vessel.

A case that sheds further light on the issues before this court, mentioned briefly hereinabove, is *Moore v. Martin Marine Transp. Co.*, 177 F.2d 561 (4th Cir.—1949), which addressed the issue of whether title to fuel oil, laden in the tanks of a vessel, passed by virtue of a sale of the vessel, her engines, boilers, tackle, apparel, furniture, etc., pursuant to a libel in rem action. In *Martin Marine*, the vessel, her engines, boilers, tackle, apparel, furniture, etc., were sold pursuant to a libel in rem filed in the United States District Court for the Eastern District of Virginia, with the sale being confirmed by the court on October 21, 1948. There was no provision in the advertisement or the resulting court order authorizing the sale of the fuel oil laden in the vessel's tanks. On the date of confirmation of the sale, the ship's master filed suit for wages due him and sought to attach the fuel oil. The District Court awarded the ship's master a personal judgment for the wages due him, but dismissed the attachment on the ground that title to the fuel oil had passed to the purchaser of the vessel under the sale. The language of the opinion provides the following insight:

> The only question before us, therefore, is whether the fuel oil laden in the tanks of the tug P.F. Martin at the time she was sold by the United States Marshal was a part of the vessel, her engines, boiler, tackle, apparel, furniture, etc., so as to pass title to this oil to the purchaser at the sale decreed in Admiralty Action no. 7217, in priority to the attachment of this oil by the appellant Moore. We think the District Court properly decided this question in the affirmative.

*Id.* at 562.

"It has been generally held that within the conventional phrase 'the ship, her engines, boilers, tackle, apparel, furniture, etc.' fall all material, apparatus and appurtenances of a ship that are closely related to her navigation and essential to her operation as a ship. To deprive an oil burning vessel of her fuel oil is to

deprive the ship of any means of motion and to negative the very purposes for which a ship is built and launched. We think, therefore, that dictates of common sense require us to uphold the District Court's decision that the fuel oil in the bunkers of the tug P.F. Martin passed to the purchaser under the sale of the tug and pursuance of the libel in rem. And we believe this doctrine is supported by the authorities."

*Id.* at 563.

Certain cases cited by the parties, i.e., *C.I.T. Corporation v. Oil Screw Peggy*, 424 F.2d 767 (5th Cir.—1970); *First Suffolk National Bank v. The Air Brant*, 125 F.Supp. 709 (E.D.N.Y.—1954); and *United States v. F/V Sylvester F. Whalen*, 217 F.Supp. 916 (S.D.Me.—1963), all deal with a lessor or conditional sales vendor attempting to recover equipment leased or conveyed under a title retention contract to the ship owner. There is definitly a split of authority as to whether a preferred ship mortgage reaches such equipment which is owned, for the sake of argument, by a lessor or a conditional sales vendor.

■ Fuel is simply not the same as leased equipment or property subject to a title retention, conditional sales contract. Once acquired, fuel becomes an integral part of the vessel, essential to its navigation and operation. No authorities contradict this conclusion.

From the evidence presented, there appear to be no preferred maritime liens which would take precedence over the ship mortgage. Therefore, under the factual circumstances found herein, this Court finds that the fuel is encumbered by the preferred ship mortgage which was properly executed and perfected.

This conclusion is further supported by the fact that all rights under the Logan Charter—Twin City agreement were assigned to Hibernia without qualification, including the right to receive all claims for damages arising out of the breach or termination of said agreement. The conveyance of the fuel to Logan Charter by Twin City as a result of the execution of the charter termination agreement would obviously constitute an element of these damages. This Court is of the opinion that Hibernia has not waived its rights under this assignment agreement, nor is Hibernia collaterally estopped from asserting the assignment agreement in this proceeding.

The Debtors and the Debtors' unsecured creditors committee do not argue that the assignment was not properly perfected in compliance with the provisions of the Uniform Commercial Code. As such, the applicability of 11 U.S.C. § 544(a) has not been made an issue.

■ Although this Court has already held, as noted hereinabove, that the terms of the preferred ship mortgage extend to the fuel and the proceeds realized from the sale of the fuel, even if this were not the case, the assignment would mandate that the fuel proceeds be paid over to Hibernia. The assignment is itself a secured transaction between Logan Charter and Hibernia and an element in the overall secured transaction between the several Logan entities and Hibernia. The Court is of the opinion that the assignment, standing alone, is dispositive of this entire proceeding.

Consequently, it is the opinion of this court that the proceeds from the sale of the fuel should be paid over to Hibernia, plus any accrued interest earned thereon, to be applied against the deficiency created following the sale of the vessels.

An Order will be entered consistent with this Opinion.