### THE PENN.

### THE LORD BALTIMORE.

(District Court, E. D. Pennsylvania. July 16, 1920.)

### Nos. 7, 8.

1. **Maritime liens �köç30—Furnisher charged with notice of terms of charter.**
   A dry dock company, which furnished labor, material, and equipment for making stability tests of two steamers, ordered by government authority, but by no one authorized to represent the owner, and which had knowledge that the steamers were under charter, *held* bound by the terms of the charter, which required the charterer to pay all expenses, and not entitled to a lien, either under Act June 23, 1910, §§ 2, 3 (Comp. St. §§ 7784, 7785), or under the general maritime law.

2. **Maritime liens ⊙ç25—"Other necessaries," in statute, construed.**
   The words "other necessaries," used in Act June 23, 1910, §§ 2, 3 (Comp. St. §§ 7784, 7785), relating to maritime liens for repairs, supplies, and other necessaries furnished to vessels, under the rule of ejusdem generis,

⊙ç For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

must be limited in their meaning to such things of the general nature of repairs and supplies as are fit and proper for the use of the ship.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Other.]

In Admiralty. Suits by the Norfolk Shipbuilding & Dry Dock Corporation against the Steamers Penn and Lord Baltimore. Decrees for respondents.

Howard M. Long, of Philadelphia, Pa., for libelant.

Thomas F. Cadwalader, of Baltimore, Md., and John Cadwalader, Jr., of Philadelphia, Pa., for respondents.

THOMPSON, District Judge. The steamers Penn and Lord Baltimore were, at the time of the matters averred in the libel, owned by the Baltimore & Philadelphia Steamboat Company, and were under charter to Charles W. Harrison and his assigns, and were being operated by the Washington-Southern Navigation Company, under assignment of the charter party, as passenger boats on the Chesapeake Bay. In July, 1919, the Supervising Inspector General of the Steamboat Inspection Service of the Department of Commerce ordered a local steamboat inspector, George L. Taylor, to make stability tests of both vessels. The vessels were taken to the shipyards of the Norfolk Shipbuilding & Dry Dock Corporation, libelant, at Norfolk, Va., and the stability tests were made under the supervision of Inspector Taylor. The purpose of the tests was to ascertain the stability of the steamers by determining the GM, or the height of the metacenter above the center of gravity, and thereby determine the seaworthiness of the vessels for the carriage of an ascertained number of passengers.

In making the tests, small narrow-gauge level tracks were installed on the decks of the vessels athwartships. Small trucks loaded with weights of given amount were placed on the tracks, which were moved from side to side across the vessel, in order that, when moved to given distances from a center, the deviation from the perpendicular caused by the listing of the vessel through the weight of the loaded trucks might be noted through the use of plumb lines extending into the hold. The trucks were loaded with junk, scrap iron, and any weighty material which happened to be about the shipyard. The tests were made at night. For the labor employed, consisting of carpenters, joiners, helpers, laborers, machinists, and blacksmiths, and for the material and equipment used, amounting in the case of the Penn to $1,229.35, and in the case of the Lord Baltimore to $1,562.82, the libelant has caused the vessels to be attached under libels for the furnishing of materials and repairs, claiming liens against the vessels by the general maritime law and under the Act of June 23, 1910.

The Baltimore & Philadelphia Steamboat Company, as claimant, filed answers, denying that the materials, supplies, and repairs were furnished at the request of the owners of the steamers, denying that they were necessary and proper, denying that they were furnished

on the credit of the vessels or of their owners, and averring that they were furnished at the sole instance and request of C. W. Harrison, or his assign, the Washington-Southern Navigation Company, the charterer of the vessels, denying that they constituted a lien on the vessels, whether by general maritime law or by statute.

The answers further set up:

(1) The materials, supplies, and repairs were not furnished upon the order of the owner or owners of the vessels, or of a person by him or them authorized;

(2) The libelant knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party the person ordering the supplies was without authority to bind the vessels.

(3) That under the terms of the charter party, as the libelant, knew, or by the exercise of reasonable diligence could have ascertained, the charterer had agreed for himself or his assigns to provide and pay all expense.

(4) That the alleged materials, supplies, and repairs were not necessary, but were unusual and of such a character as to put the libelant upon inquiry as to the terms upon which the steamers were being operated.

[1] The answers put the burden upon the libelant of proving the authority of the person ordering the labor and material for the stability tests. This burden has not been met, as there has been no evidence to show upon whose order the work was done and the materials supplied. The Act of June 23, 1910 (Comp. St. §§ 7784, 7785), provides as follows:

Section 2: "The following persons shall be presumed to have authority from the owner or owners to procure repairs, supplies, and other necessaries for the vessel: The managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted. No person tortiously or unlawfully in possession or charge of a vessel shall have authority to bind the vessel."

Section 3: "The officers and agents of a vessel specified in section two shall be taken to include such officers and agents when appointed by a charterer, by an owner pro hac vice, or by an agreed purchaser in possession of the vessel, but nothing in this act shall be construed to confer a lien when the furnisher knew, or by the exercise of reasonable diligence could have ascertained, that because of the terms of a charter party, agreement for sale of the vessel, or for any other reason, the person ordering the repairs, supplies, or other necessaries was without authority to bind the vessel therefor."

It does appear, however, that Mr. Guy, the superintendent of the libelant company, knew that the vessel was chartered by a company that was running a new line between Norfolk and Washington from the Chesapeake & Ohio piers. It is apparent that the work done upon the stability tests was not strictly included within the term "supplies, repairs, or necessaries." The knowledge on the part of Mr. Guy was sufficient to put the libelant on inquiry as to the existence and the terms of the charter party, but the libelant failed to make any inquiry and furnished the work and supplied the material to make the tests without any inquiry whatever. Having, therefore, been put upon inquiry, and failing to make the necessary inquiries, the libel-

ant did not acquire a lien against the vessels, even assuming that the labor and material furnished came within the general head of "necessaries." The Valencia, 165 U. S. 264, 17 Sup. Ct. 323, 41 L. Ed. 710.

The services rendered in this case were not shown to have been necessary for the operation of the vessels, nor to have been a charge for which the owners would be liable under its charter party. While there may be a maritime lien for services rendered to a vessel, and there may be a presumption that such services were rendered on the credit of the vessel, such as in the case of salvage or pilotage services, whether such presumption arises, or whether the lien exists, depends on the nature of the services and the circumstances under which they are rendered. The Alligator et al., 161 Fed. 37, 88 C. C. A. 201. In that case Judge Grey said:

"There are maritime services which are usually rendered under circumstances which make them so essential to the movement of a vessel, and to the performance of her primary function, as an instrument of commerce, that the admiralty law presumes they are rendered on the credit of the vessel, in the absence of proof to the contrary, and creates a maritime lien in their favor, independently of the question whether it be a domestic vessel or not. Notable examples are the lien for pilotage services. The lien for seamen's wages, for towage services, and for salvage services. The reasons for the rule in these cases are obvious, and arise out of the necessities of the situation. * * * The peculiar exigency of the situation in all these cases, supplies the reason for the rule of presumption of lien, as it has been long recognized in the administration of the general admiralty law. The exigency for such services, as are above enumerated, so generally exists that the rule of presumption of lien is sometimes dissociated from the reason upon which it is founded. The service of a diver can be imagined as rendered under circumstances so exigent as to come within the reason of the rule of presumption of lien, as the service may have been necessary to prevent the immediate sinking of a vessel, but the service of the same diver in examining a sunken wreck, or the bottom of a ship lying in port, to discover whether its general condition required that the ship should be docked, would come within a different rule. So a towage service, as ordinarily performed, is a maritime service, which from the peculiar situation of the parties and of the circumstances of necessity surrounding it, and in the absence of proof to the contrary, creates a presumption of credit given to the vessel and a consequent lien. But why, where the relation of the parties and the circumstances attending the performance of the service are different from those ordinarily obtaining, should this same rule of presumption apply? If the reason ceases, why should not the law cease?"

[2] The words "other necessaries," used in the statute, must, under the rule of ejusdem generis, be limited in their meaning to such things, of the general nature of repairs and supplies, as are fit and proper for the use of a ship. The J. Doherty (D. C.) 207 Fed. 997. The libelant has failed to establish that the labor and material furnished were ordered by any one who under the law could bind the vessels by maritime lien. It has failed to show that they come within the terms of the Act of June 23, 1910. It does appear that the services were rendered and the supplies furnished under such circumstances as to put the libelant upon inquiry which would have shown that under the charter of the vessels the repairs and supplies were to be at the expense of the charterer.

The libels are dismissed.