### THE PENN.

### THE LORD BALTIMORE.

(Circuit Court of Appeals, Third Circuit. February 23, 1922.)

No. 2706.

Maritime liens ☞65—Proof of authority from owner of agent for necessaries essential to lien.

In the absence of evidence showing at whose instance alleged necessaries were furnished to a vessel, a lien cannot be established therefor, either under the general maritime law or Act June 23, 1910 (Comp. St. §§ 7783–7787).

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

Suits in admiralty by the Norfolk Shipbuilding and Drydock Corporation against the steamer Penn and the steamer Lord Baltimore. Decree for respondent, and libelant appeals. Affirmed.

For opinion below, see 266 Fed. 933.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Howard M. Long, of Philadelphia, Pa., and Albert L. Roper, of Norfolk, Va., for appellant.

Thomas F. Cadwalader, of Baltimore, Md., and John Cadwalader, Jr., of Philadelphia, Pa., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below the Norfolk Shipbuilding & Drydock Corporation, hereafter called the Norfolk Company, filed a libel against the steamer Penn and another against the steamer Lord Baltimore. The Philadelphia & Baltimore Steamboat Company, hereafter called the Philadelphia Company, the owner of the steamers, appeared and defended. The court below heard the testimony, and dismissed the libels. Thereupon the Norfolk Company took this appeal.

The cases, which involve the same questions were heard together, both below and here. The claim of the latter company was for labor and materials supplied by it in making a "stability test" of each vessel, under the directions of the Steamboat Inspection Service of the United States government. The general facts of the case are clearly stated in this extract from the opinion of the court below, viz.:

"The steamers Penn and Lord Baltimore were, at the time of the matters averred in the libel, owned by the Baltimore & Philadelphia Steamboat Company, and were under charter to Charles W. Harrison and his assigns, and were being operated by the Washington-Southern Navigation Company, under assignment of the charter party, as passenger boats on the Chesapeake Bay. In July, 1919, the supervising inspector general of the Steamboat Inspection Service of the Department of Commerce ordered a local steamboat inspector, George L. Taylor, to make stability tests of both vessels. The vessels were taken to the shipyards of the Norfolk Shipbuilding & Drydock Corporation, libelant, at Norfolk, Va., and the stability tests were made under the supervision of Inspector Taylor. The purpose of the tests was to ascertain the stability of the steamers by determining the G. M., or the height of the metacenter above the center of gravity, and thereby determine the seaworthiness of the vessels for the carriage of an ascertained number of passengers. In making the tests, small narrow-gauge level tracks were installed on the decks of the vessels athwartships. Small trucks loaded with weights of given amount were placed on the tracks, which were moved from side to side across the vessel, in order that, when moved to given distances from a center, the deviation from the perpendicular caused by the listing of the vessel through the weight of the loaded trucks might be noted through the use of the plumb lines extending into the hold. The trucks were loaded with junk, scrap iron, and any weighty material which happened to be about the shipyard. The tests were made at night. For the labor employed, consisting of carpenters, joiners, helpers, laborers, machinists, and blacksmiths, and for the material and equipment used, amounting in the case of the Penn to $1,229.35, and in the case of the Lord Baltimore to $1,562.82 the libelant has caused the vessels to be attached under libels for the furnishing of materials and repairs, claiming liens against the vessels by the general maritime law and under the Act of June 23, 1910. The Baltimore & Philadelphia Steamboat Company, as claimant, filed answers, denying that the materials, supplies, and repairs were furnished at the request of the owners of the steamers, denying that they were necessary and proper, denying that they were furnished on the credit of the vessels or of their owners, and averring that they were furnished at the sole instance and request of C. W. Harrison, or his assign, the Washington-Southern Navigation Company, the charterer of the vessels, denying that they constituted a lien on the vessels, whether by general maritime law or by statute."

Assuming for present purposes that the labor and materials furnished, but which the court below found were not necessaries, were necessaries, and the prices charged therefor were correct, we turn to the proofs to inquire whether the libelant has established by the weight of the testimony the allegation of its libel that it, "at the request of the owners of said steamer or their agents, furnished to her certain materials and repairs," an allegation denied by the answer.

In taking up the proofs, we note that we are dealing with a modern business corporation, whose work is presumably carried on in accordance with modern business practices. In such large companies, business transactions necessarily pass through a number of persons, and in the nature of things cannot be left to the recollection of these different people, but usually take the form of written confirmations and authorizations. Whatever may be the reason, there is an entire and unexplained absence of all such customary written data, request, authorization, or estimate of work, and, indeed, of any written evidence of the transaction here involved. In this situation, recognizing as we do that, in business transactions with organizations with large executive staffs, such practice is almost imperatively necessary, the fact that no such record was produced tends to support the conclusion that no authorized order was given to the libelant's officials by any officer of the owner, or, in the words of the statute of June 23, 1910 (Comp. St. § 7784), by "the managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is intrusted." . The trial judge had the witnesses before him, and his finding in that regard is: "There has been no evidence to show upon whose order the work was done." No officer of the Norfolk Company was called who testified with whom or when any contract was made or arrangement entered into for this work. The only officer of the libelant called in reference to the existence of a contract or order was James R. Guy, the superintendent. He testified that he was called into the office of the general manager of the libelant, and there met Taylor, who was in the employ of the United States local board of steamboat inspectors, under whose supervision the work was done. Guy's testimony was:

"Q. At that meeting you saw Mr. Taylor? A. Yes, sir. Q. And certain conversation was had by you, Mr. Taylor, and Mr. Seemer? A. Yes, sir. Q. With reference to these vessels? A. Yes, sir. Q. And as the result of that conversation you did something; state what you did do. A. Inclined the Lord Baltimore and the Penn. Q. What did you do? I want to know the purpose of it. A. The purpose of the inclining was to determine the metastatical height of the vessel above the center of gravity, from which you can arrive at an idea of its stability."

From this it will be seen that Guy had nothing to do with any contract or order for the work, but he simply took his orders from Seemer, the general manager, who at that time ordered the tests to be made; but Seemer was not called to show what prior authorization he had. The only employee of the Philadelphia Company who had any connection with the subsequent carrying on of the test thus directed by Seemer was Wright, as to whom Taylor testified:

"Q. Will you tell us, now, whether Mr. Wright got there after the tests had started, or the work preparatory to making the tests had started? A. As

I cannot remember exactly what time he came, I am unable to answer that question. Q. Did Mr. Wright, so far as you know, give any orders or directions to the Norfolk Shipbuilding & Drydock Company with regard to this work? A. I cannot say. Q. So far as you know, he did not? A. That is correct. I was not present, though, when the arrangements were made to have the vessels taken off their run for the tests. Q. You did not hear him give any orders while the work was going ahead? A. No, sir; although he may have given such orders without my knowledge. Q. Did you instruct the Norfolk Shipbuilding & Drydock Company that it was desirable to have the work done with the greatest speed possible, in order to keep the boats on their respective runs? A. I did not give the Norfolk Shipbuilding & Drydock Company any direct instructions, but the whole job was discussed before Mr. St. John and Mr. Noel and the officers of the boats, all with the view of obtaining the results of the tests in the least possible time. Q. You had nothing to do with that? A. I was not directly concerned in the discussion, although I knew about it. Q. Was that discussion held in your presence? A. Some of it was; but I would not say that all of it was held when I was there. Q. What was said in that conversation, and where was it held, if you remember? Q. I cannot say just where the conversation took place; I don't remember that exactly. Q. Can you tell us who were present? A. I think that some of that talk was in Mr. St. John's office; probably not all of it. Q. Who else were present, besides yourself? A. *I think that Mr. St. John and Mr. Noel and the master of the vessel; but I am not certain as to that.* The arranging for these tests was something with which I had nothing directly to do. I was there to carry out my orders and actually make the tests at the appointed time and place. Q. Mr. St. John, Mr. Noel, and yourself did have some talk about it, did you? A. Yes, sir. Q. Was any representative of the Norfolk Shipbuilding & Drydock Company present then? A. I am not certain, but I am inclined to think that some of the arrangements were made through the office with the Norfolk Shipbuilding & Drydock Company. Q. At Norfolk? A. Yes, sir. Q. Did you have any conversation with Mr. Guy and Mr. Seemer, in Mr. Seemer's office, prior to the commencement of this work? A. I did have, after I understood that the boats had been turned over to that company. Of course I have absolutely nothing whatever to do with ordering the boats to go to anybody's place to have the tests made. Q. You had nothing personally to do with ordering the boats to go to the Norfolk Shipbuilding Company's plant to have the tests made? A. Nothing at all. Q. And you do not know personally who selected that company for this work? A. I do not know that. Q. But, after they had been selected, you did have some talk with them about it? A. Yes, sir; because, if I am to have charge of these tests being made, it is up to me to see that the arrangements are made, so that they can be carried into effect in the way that I decide."

When to the indefiniteness of Taylor's testimony, and its failure to show any authorization of the work at such time, there is added the fact that neither St. John, Noel, nor the master of the vessel were subsequently called to prove what then took place, the case is barren of any affirmative proof of any authorization of the work, at that time or any other time, by any one with statutory or other power to bind the owner.

In the absence of such proof by the witnesses who were called, in view of the nonexistence of any record of this transaction made by the libelant, and in the light of the noncalling of witnesses who, if any contract was made or order given, would likely have known of such fact, we are warranted in following the court below, and affirming its decree.