Richard A. PAYNE et al., Plaintiff,

v.

SS TROPIC BREEZE, Defendant,

and

Apostolos Samadjapoulos, National Western Life Insurance Co., Inc., Intervenors.

Civ. No. 453–67.

United States District Court
D. Puerto Rico.

Oct. 15, 1968.

Nachman, Feldstein, Laffitte & Smith, San Juan, P. R., for plaintiff.

McConnell, Valdes, Kelley & Sifre, San Juan, P. R., for defendant.

MEMORANDUM OPINION

CANCIO, Chief Judge.

The claim of intervenor, Apostolos Samadjapoulos, Master of the SS Tropic Breeze, came up for hearing before this Court on March 8, 1968 for the purpose

of determining the amount that he is entitled to recover under the complaint filed by him on August 15, 1967. The defendant, a vessel of Liberian registry, arrived in San Juan, Puerto Rico, on or about June 26, 1967 for routine drydocking. Some days after its arrival, the crew members demanded their wages due, but the Master, due to the owner's failure to provide the necessary funds, was unable to pay them. After stores and supplies had been exhausted and the crew were compelled to endure several days without food, an action *in rem* was filed by them on July 3, 1966.

The Master, nonetheless, endeavored to raise sufficient funds to pay and feed the crew and release the vessel. He requested money from the charterer but the latter refused to make any advance. He then traveled to New York attempting to get money from the owner. His efforts were unsuccessful and when he realized the hopelessness of the situation, he filed an intervening complaint claiming wages, advances and traveling expenses. Several other parties also intervened in the proceedings claiming maritime liens on the defendant vessel. One of those lienors, National Western Life Insurance Company, Inc., hereinafter referred to as "National" claimed to have a first preferred mortgage lien on the SS Tropic Breeze, which claim was eventually allowed by order of this Court on January 12, 1968.

Because the owners of the vessel did not file a claim, release the vessel and answer the complaint as required by Rules C and E of the Supplemental Rules for Certain Admiralty and Maritime Claims, the Court on September 29, 1967, upon petition of all parties before the Court at the time, ordered the sale of the SS Tropic Breeze.[1] An amended order for the sale of the vessel was subsequently filed and entered on October 4, 1967. The sale would have been consummated in accordance therewith and the proceeds of the sale deposited in the registry of the Court had it not been for a petition by National, in which all other parties joined through a stipulation dated November 1, 1967. Said stipulation provided for National to deposit into the registry of the Court the aggregate amount of all claims that the Court would find to have priority over its claim as mortgagee and to make such deposit within five days after the Court's determination.

Eventually, the mortgagee was permitted to purchase the vessel by bidding the balance due on its mortgage and agreeing to pay all claims that have priority over said mortgage. Said sale was confirmed on January 11, 1968. In other words, National is required to pay according to its stipulation and the order of Confirmation of Sale those claims for maritime liens which the Court finds to have priority over its claim as mortgagee.

As a result of the foregoing, National has objected to and defended against the claims of all other lienors intervening in this case, including that of Apostolos Samadjapoulos. It first objected to the latter's intervention alleging that he did not have a maritime lien for wages and traveling expenses. The objection was denied and the intervention allowed as to all his claims by an order dated September 26, 1967. Payne et als. v. SS Tropic Breeze, 274 F.Supp. 324, 328 (D.P.R. 1967).

On March 8, 1968, the Court heard the Captain's testimony as to all the matters alleged in the complaint. Documentary evidence consisting of numerous disbursement receipts and the monthly statements of account of the vessel's income and expenses were produced and admitted in evidence and marked as Exhibits 1 to 8, inclusive. Each of these exhibits represent the monthly flow of the vessel's funds beginning in November of 1966 and ending in June of 1967.

These exhibits together with the Master's General Accounts, (Exhibits 1 and 2 at hearing of claim for crew's wages), are the basis for his claim of advances,

---

1. The only issue as to the sale of the vessel was whether the sale would be with reservation of title on behalf of intervenor Tropical Commerce Corp.

which, in effect, is a claim for the difference or balance in his favor at the end of the period from an "open account".

He also testified as to his wage claim and other expenses he had to incur as a result of an order of this Court dated after the vessel was under *custodia legis*.

National was the only party opposing all the Master's claims but its opposition consisted solely of cross-examining him. Although at its request the Court continued the hearing for a later date in order to allow it an opportunity to further cross-exam the witness and to produce proof contrary to his claim, no such proof was ever brought to the Court's attention. On the contrary, it appears from a Stipulation dated April 2, 1968, that National has waived further cross-examination of Captain Samadjapoulos, and admitted the authenticity of certain additional documents which he had brought from New York and which would have been offered in evidence at the hearing, which further substantiate his claim for advances. These documents have also been considered by the Court, as no objection to their admissibility has been advanced by National.

The Court thereafter granted National several more opportunities for bringing a witness from New York and even for taking his deposition in lieu of his testimony in Court, but it failed to produce that witness' testimony. Finally, the Master's claim was taken under advisement pending the filing of memoranda of law on his right to a maritime lien for advances and on the issue of priorities. His lien for wages and traveling expenses were allowed with priority by the order of September 26, 1967, and his lien for advances and disbursements is allowed by the order filed simultaneously with this judgement.

In view of the foregoing orders all of the Master's claims have been allowed, with priority over the mortgage, as a matter of law. Now, after hearing the Master's uncontradicted testimony and reviewing the documentary evidence on record, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Apostolos Samadjapoulos, the intervening plaintiff, is a citizen of the United States of America and a resident of the State of New York. At all times relevant herein he was employed as Captain of the defendant vessel.

2. The SS Tropic Breeze, the defendant, is a vessel flying the flag of the Republic of Liberia and subject to the laws of that country.

3. The intervenor, National Western Life Insurance Co., Inc., is at all times pertinent herein, the holder of a promissory note, secured by a first preferred mortgage on the SS Tropic Breeze, which mortgage was duly executed and registered in accordance with the laws of the Republic of Liberia.

4. Captain Samadjapoulos was employed at New York City in late October 1966 and assumed command of the vessel on November 1, 1966. As Master of the vessel he had several duties and responsibilities, among which was his responsibility for the safety and health of the crew and for the vessel's funds and disbursements therefrom. Every month the owner would provide him with funds, from which he would pay for all of the expenses necessary to maintain the vessel in operation, including crew's wages, food, supplies, stores, repairs and many other necessaries. At the end of each month he would prepare an account of all the funds received and of all expenditures, in the form of debits and credits. If a balance (credit or debit) remained it would be brought forward on the following month's statement of account. This accounting procedure continued from November 1, 1966, until June 30, 1967, at which time the accounts (Exhibits 1 through 8 of Master's claim, Exhibits 1 through 5 of crew's wage claim and Exhibits as per Stipulation of April 2, 1967) reflected a balance in the Master's favor of $8,870.78. This sum, the Court finds to be correct in accordance with the exhibits which the parties stipulated to admit in evidence. Each disbursement entry is supported by a receipt, bill or invoice kept in an envelope together with

the statement of account for that particular month.

■ 5. The Court finds that the owners did not provide the Master with sufficient funds to pay for all of the vessel's expenses. The largest share of the monthly disbursements went to pay crew's wages, as shown by the monthly statements. As a matter of fact, the November statement (Exhibit 1) shows a disbursement of $9,700 to Captain Barrado, the previous master, for wages due. Additional funds do not appear to have been provided by the owner for this extraordinary disbursement. The remaining disbursements were to pay for necessaries, supplies and repairs for the vessel.

At the end of each month, the Master would send to the owner the Master's General Account (Exhibits 1 and 2 of Crew's wage hearing) and in accordance therewith, would request those funds he had estimated were necessary to meet the expenses for the following month. Funds received were usually less than what he had requested. This situation was the cause for a balance of $8,870.78 in favor of the Master as of June 30, 1967.

Many times an expenditure had to be incurred for which the vessel lacked funds. The Master would then pay for such out of his own personal funds. He testified that such was the traditional practice and custom in the industry in order to assure the vessel's continued operation. He stated that in previous vessels and on the one he is presently serving as Master, the same arrangement exists except that he always is reimbursed. In this case the Court finds that Captain Samadjapoulos, in the best tradition of the sea, has met the standards of a captain's concern for his crew even to the extent of exhausting his personal savings, and becoming personally indebted to others so that his men would not want. His effort and dedication enabled the Tropic Breeze to stay in operation despite the owner's and charterer's neglect, both of whom eventually abandoned the ship and the crew.

The Court finds that Apostolos Samadjapoulos is entitled to the sum of $8,870.78, which amount was actually spent and disbursed by him on behalf of and for the benefit of the vessel.

6. That above amount must be reduced by the sum of $500.00 which he testified to have received from an agent in St. Martin before coming to Puerto Rico in June of 1967, leaving a net balance in his favor of $8,370.78.

7. Captain Samadjapoulos was hired on articles at a monthly salary of $700.00. According to the evidence and his testimony he was paid all his wages except for the month of June. The Court finds that he is entitled to $700.00 as wages for the month of June 1967, and is also entitled to 3 day wages in July 1967, before the vessel was arrested amounting to $69.99.

8. The Master is also entitled to wages for waiting time under the provisions of 46 U.S.C.A. §§ 596 and 597 for the period of time commencing after the vessel's arrest until he obtained other employment. The vessel was seized on July 3, 1967 and from then until July 21, 1967, when he left the SS Tropic Breeze for another job, he is entitled to recover twice his daily wage rate, or $46.66. For those 18 days waiting time, Captain Samadjapoulos is entitled to the sum of $839.88.

9. Some days before the seizure of the vessel, when the crew had demanded their wages due, he traveled to New York for the purpose of trying to obtain funds from the owner. He expended $121.40 for air travel and $30.00 in expenses. Although the trip was unsuccessful, he is nevertheless, entitled to recover the sum of $150.00 which he expended from his personal funds and which the Court finds reasonable.

10. On July 3, 1967, the vessel was seized and on July 14th, the Master was brought before the Honorable Elmo B. Hunter, sitting by designation, pursuant to a Show Cause Order dated July 11, 1967. At that hearing, Captain Samadjapoulos agreed to provide the crew with

food during *custodia legis*. In compliance with his agreement to the Court and the subsequent Order entered, he gave the crew from his own funds $300.00 to buy food. He is entitled to the reimbursement of this expenditure as an expense of *custodia legis*.

11. At said hearing he also agreed to return to New York to attempt once more to get money to pay and feed the crew. Once again his efforts failed. This trip cost an additional $150.00, which he is entitled to recover, and, which the Court finds to be reasonable.

12. Although unable to raise funds on this last trip to New York, Captain Samadjapoulos was successful in obtaining employment on board another vessel for six crew members and himself. Since these men lacked the funds to pay for their transportation to Baltimore, Maryland, he spent a total of $364.20 of his own funds for air fare. Each one-way ticket cost $60.70. Had he not paid these fares, the costs of maintaining these crew members and the cost of their repatriation, would have been an enormous custodia legis expense. This expenditure was therefore, for the benefit of the administration of the property in the custody of the Court. The amount is reasonable and allowed.

13. The Court finds that the total amount which Captain Samadjapoulos is entitled in accordance with the evidence on record is the sum of $10,944.85.

14. The Court finds that National by stipulation with the parties agreed to pay all such claims as found to have priority over its claim as mortgagee. It is therefore directly liable to the Master for the amount of $10,944.85 which this Court has found to be owed to him by the defendant vessel.

15. Legal interest is allowed on the foregoing amount from July 21, 1967, the last date on which disbursements were made on behalf of the vessel or on behalf of the Court's administration.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter.

2. The Master herein has a maritime lien for all the advances and disbursements made on behalf of the vessel. (Order filed simultaneously with this opinion allowing a maritime lien for advances and cases cited therein.)

3. Advances made to a vessel to discharge maritime liens, acquire by subrogation the same rank and priority as the lien discharged. (Order filed simultaneously with this opinion and cases cited therein.)

4. The Master's lien for advances to pay crew's wages had priority over the mortgage claim of National. (Section 7 of the First Preferred Ship's Mortgage, Order filed simultaneously with this opinion and cases cited therein.)

5. The Master's lien for advances to pay for repairs, supplies, stores and other necessaries, also has priority over the mortgage lien of National. (Order filed simultaneously with this opinion and cases cited therein.)

6. The Master of a Liberian vessel has the same rights in regards to wages as the crew. Section 298 of Title 22 of the Liberian Code of Laws of 1956, as amended in 1964.

7. The Master of a Liberian vessel has a maritime lien for wages to the same extent as an ordinary seaman. Payne v. SS Tropic Breeze, 274 F.Supp. 324 (D.P.R.1967).

8. Having the same rights as a seaman, the Master of a Liberian vessel is entitled to a statutory compensation under 46 U.S.C.A. § 596. Samad v. The Etivebank, 134 F.Supp. 530 (E.D.Va. 1955).

9. The Master's maritime lien for wages has priority over all other preferred liens and claims, subordinate only to the expenses of *custodia legis*.

10. The Master has a maritime lien for traveling expenses. Payne v. SS Tropic Breeze, 274 F.Supp. 324, 328 (D.P.R.1967), which lien has priority over the mortgage lien of National.

11. Having incurred expenses after the vessel was arrested, the

Master does not have a maritime lien for such disbursements. However, being incurred for the benefit of the crew, the traditional wards of the Court, this Court will allow the expenditures for food, traveling expenses and repatriation as an expense of *custodia legis* with priority over all other liens and claims. New York Dock Co. v. The Poznan et al. (1927) 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955.

12. The Master is entitled to judgement in the total amount of $10,944.85, with interest thereon at six percent (6%) per annum from July 21, 1967, until paid.