423 F.2d 236
 Richard A. PAYNE et al., Plaintiffs,
v.
SS TROPIC BREEZE, her engines, boilers, furniture, apparel,
appliances, appurtenances, equipment, etc., Defendant, and
National Western Life InsuranceCompany,
Intervenor-Appellant, and Apostolos Samadjopoulos,
Intervenor-Appellee.
 No. 7313.
 United States Court of Appeals, First Circuit.
 March 11, 1970.
 
 Richard C. Lewis, Miami Beach, Fla., for appellant.
 Gustavo A. Gelpi, San Juan, P.R., with whom Harvey B. Nachman and Nachman, Feldstein, Laffitte & Smith, San Juan, P.R., were on brief, for Apostolos Samadjopoulos, appellee.
 Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.
 McENTEE, Circuit Judge.
 
 
 1
 The SS TROPIC BREEZE, a vessel of Liberian registry, was libeled in rem in Puerto Rico by members of its crew asserting claims for wages. The Master, the present appellee, was permitted to intervene by the district court[1] in order to assert various claims against the vessel.[2] The owners of the vessel did not appear and the court ordered the sale of the ship. At that point, National Western Life Insurance Company (hereinafter National), an intervenor and assignee of a mortgage on the vessel, entered into a stipulation with the other claimants postponing the sale, agreeing to satisfy all claims which the court found had priority over its mortgage, and undertaking to pay into court funds sufficient to cover the Marshal's expenses and the crew's wage and penalty claims. The district court held that all of the Master's claims were superior to the mortgage and entered judgment against National for $10,944.85, plus interest.[3] National appeals.
 
 
 2
 Before dealing with the merits, we must dispose of the Master's contention that National waived its right to appeal when it entered into the stipulation postponing the sale. The language of the stipulation relied upon as constituting the waiver is as follows:
 
 
 3
 'Intervenor National Western Life Insurance Company heerby agrees to deposit into the Registry of the Court the aggregate amount of all such other claims that the Court may find as having priority over the claim filed, as mortgagee, by said Intervenor, such deposit to be made within five (5) days after the Court's determination.'
 
 
 4
 The Master contends that the undertaking to deposit the aggregate of prior claims within five days of the court's determination, without any mention of a delay pending appeal, indicates an intention that no appeal be taken. He draws support for this reading from a subsequent paragraph of the stipulation which explicitly noted that one of the intervenors, not a party to this appeal, signed without prejudice to an appeal from the order of sale, pending at the time of the agreement.
 
 
 5
 Assuming that an agreement to waive an appeal is enforceable,[4] we cannot agree that this stipulation constitutes such an agreement. To begin with, the language relied upon does not speak directly to the subject of appeals. It merely provides that the money be paid into court. No provision calling for the immediate distribution of the funds to the claimants is included. Therefore, there is nothing in the quoted paragraph, standing alone, to support the Master's reading. The presence of the paragraph reserving rights under a pending appeal by another intervenor does not alter our conclusion. The appeal referred to in that instance was pending at the time the stipulation was agreed to. There is no reason to infer that appeals on other issues, as to which there had been no rulings at the time, were intended to be waived. The intention to waive the right to appeal must appear clearly from the stipulation.[5] That condition is not satisfied here.
 
 
 6
 This brings us to the merits. We pause, however, to deal with the issue of the law governing priorities among maritime liens and mortgages.
 
 
 7
 In casting their argument on this point in traditional choice-of-law terms, the parties seem to have misapprehended the nature of the question. The Ship Mortgage Act[6] establishes the relative priorities of foreign ship mortgages and other maritime liens. It is axiomatic that Congress has the power 'to condition access to our ports by foreign-owned vessels upon submission' to our law, substantive and procedural. Lauritzen v. Larsen,345 U.S. 571, 592, 73 S.Ct. 921, 933, 97 L.Ed. 1254 (1953). The crux of the matter, then, is whether Congress so intended the priority provisions of the Ship Mortgage Act. We conclude that it did.
 
 
 8
 Two factors are determinative of this result. The Act and its history leaves little room for doubt that Congress intended to have the Act apply to all foreclosures of foreign ship mortgages in American courts.[7] Moreover, such a reading of the statute is entirely consistent with general principles of maritime law-- an important consideration under Lauritzen-- because priorities among maritime liens have traditionally been regarded as governed by the law of the forum.[8] We therefore see no obstacle to the application of the Act in this case.
 
 
 9
 The structure of the Ship Mortgage Act is as follows: a mortgage which meets certain statutory criteria[9] is deemed a 'preferred mortgage' and constitutes a lien upon the vessel, enforceable in rem, and superior to all claims against the vessel except 'preferred maritime liens,' expenses and fees allowed, and costs taxed by the court. 46 U.S.C. 951, 953(b) (1964). A 'preferred maritime lien,' insofar as is relevant to this case, is 'a lien * * * for wages of the crew of the vessel, * * *' 46 U.S.C. 953(a)(2) (1964). In addition, the Foreign Ship Mortgage Act subordinates a mortgage on a foreign vessel to 'maritime liens for repairs, supplies, towage, use of drydock or maritime railway, or other necessaries, performed or supplied in the United States.' 46 U.S.C. 951, cl. 2 (1964). In order to prevail, therefore, the Master must bring each of his claims within one of three categories: (1) a lien 'for wages of the crew of the vessel'; (2) 'expenses and fees allowed and costs taxed by the court'; or (3) a lien 'for repairs, supplies, * * * or other necessaries, performed or supplied in the United States.' We deal with the claims seriatim.
 
 Post-Arrest Expenses
 
 10
 Following the arrest of the vessel, the Master gave the crew $300 from his own funds to buy food, spent an additional $364.20 for airplane fare to enable a number of his crew members to fly to Baltimore, Maryland, to take up other employment, and travelled to New York, with the court's approval, to seek funds from the owners, at a cost of $150. The district court held that the Master's claims for reimbursement for the cost of food and crew member transportation had priority over all other claims, as expenses while the ship was in custodia legis, and allowed the travel expense claim as well. Those rulings were plainly correct.
 
 
 11
 Expenditures while a ship is in custodia legis do not give rise to maritime liens. However, the Supreme Court has held that a district court, sitting in admiralty, has the equitable power to give priority to claims arising from the administration of property within the court's jurisdiction.[10] This rule is plainly consistent with 46 U.S.C. 953(b)(2) (1964).[11]
 
 Travel Expenses
 
 12
 The Master also claims $150 for the expense incurred by him in travelling to New York in his first attempt to secure funds from the owner, which took place prior to the seizure of the vessel. In order to prevail on this item, all that need be shown is that the travel expenses were 'other necessaries' under 951,[12] as the Master's authority to subject the vessel to such a lien is not in dispute.[13]
 
 
 13
 In this connection, it is helpful to consider the background of the lien for necessaries in the general maritime law, as it antedated the passage of the statutory provisions in question by many years. The basic rationale has been well stated as follows:
 
 
 14
 'It is usually for the advantage of all parties having an interest in a ship, whether such interest be in the nature of ownership or security, that she should be actively engaged in commerce and not left to rot in port. But to continue in active employment she must have supplies and services. To obtain them she must have credit. Admiralty law in most countries secures this for her by implying a maritime lien in favor of those who furnish such necessaries * * *.' Note, What Law Governs Maritime Liens, supra n. 8, at 356-57; accord, The J. E. Rumbell, 148 U.S. 1, 13 S.Ct. 498, 37 L.Ed. 345 (1893). The St. Jago de Cuba, 22 U.S. (9 Wheat.) 409, 6 L.Ed. 122 (1824)
 
 
 15
 In 1910, Congress passed the Federal Maritime Lien Act, 46 U.S.C. 971-975 (1964), which conferred a maritime lien for 'repairs, supplies, * * * or other necessaries * * *.'-- precisely the same language later employed in 951. In construing that Act, courts often limited 'other necessaries' to items ejusdem generis the preceding specific objects of liens-- repairs, supplies, et cetera.[14] Over the years, however, the construction of 'other necessaries' has broadened to the point where, according to one commentator, it includes almost any goods or services which are convenient or useful to the vessel.[15]
 
 
 16
 We think that a broad interpretation is more consistent with the purpose of the Act than the earlier, narrow approach. The principal concern is to keep the ship active, thereby facilitating the flow of commerce and protecting the interests of the owners and secured parties. The determination of what items constitute 'other necessaries' must be made in light of this consideration. The appropriate test, therefore, is whether the goods or services in question were necessary to the continued operation of the vessel.
 
 
 17
 Measured by this standard, the Master's trip to secure funds, in the circumstances of this case, must be deemed a necessary. The TROPIC BREEZE was under an imminent threat of being arrested on the libel of its crew. An arrest promised to, and in fact did, terminate the voyage and jeopardize both the owner's and mortgagee's interests. Action reasonably essential to an effort to forestall such an occurrence, whether successful or not, is in furtherance of the underlying policy of the lien and the expenses incident thereto give rise to a maritime lien for necessaries.
 
 
 18
 We are supported in this view by Congress' apparent intention that the statute be read expansively. The language of 951, cl. 2, as we have noted, is identical to that of 971, which was adopted forth-four years earlier. The tendency to disregard the strict application of the ejusdem generis rule and to give the statute a broad reading was evident in 1954 when the relevant portion of 951 was enacted. Congress' use of the 971 language in the Foreign Ship Mortgage Act is strong evidence of its approval of the then-current judicial interpretation of that section and its intention that the new statute be similarly construed.[16] Moreover, the Foreign Ship Mortgage Act, while giving a foreclosure remedy to holders of foreign ship mortgages, was clearly intended to maintain the superior position of American suppliers of goods and services to foreign vessels.[17] A narrow construction of 'other necessaries' would tend to work against this significant purpose of the legislation.
 
 
 19
 We conclude that the district court was correct in allowing a lien for these travelling expenses and in according it priority over the mortgage.
 
 Wages, Double Wages and Disbursements
 
 20
 The balance of the Master's claims may be dealt with together, as the priority of each is dependent upon whether it is a preferred maritime lien under 953(a) (2). Indeed, the question is even narrower, for the priorities turn on whether a master's wage claim, assuming it to be a lien, is a lien 'for wages of the crew of the vessel, * * *'[18]
 
 
 21
 The term 'crew' does not have a fixed meaning in the law. Rather, the scope of the phrase must be determined in light of general principles of maritime law and the policies sought to be promoted by the statute under consideration.
 
 
 22
 It will be observed that wage liens of the crew are accorded a highly favored position under the Act. They receive priority over preferred ship mortgages in spite of the overriding statutory purpose of protecting the security of holders of such mortgages.
 
 
 23
 This is entirely consistent with the status of seamen's wage claims under the general maritime law as applied by United States courts. The services of seamen are absolutely essential to the navigation of the vessel[19] and they have been in a particularly helpless position down through history. They have been treated, therefore, as wards of admiralty and their wages given priority over all other claims.[20] Never has this been more forcefully put than by Justice Gray, who stated that seamen's wages 'are sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as security for his wages.'[21]
 
 
 24
 Juxtaposed to the treatment of ordinary seamen is that of the master. As early as 1828 it was regarded as settled that the master had no lien against the vessel for his wages.[22] Our attention has been called to no contrary holding in the intervening years. It was not until 1968 that Congress, after recognizing the ancient rule,[23] enacted legislation giving masters of American vessels liens for wages of the same rank and priority as seamen's wage liens.[24]
 
 
 25
 In view of this history, it is unlikely that the phrase in question was intended to include masters. Nothing was to be accomplished by such use of the term, as masters did not have maritime liens upon which the statute could operate. Their inclusion would have been meaningless.
 
 
 26
 It might be argued that although inclusion of masters would have been of no significance in the application of the Act to masters of American vessels, this was not necessarily so in the case of foreign vessels. American courts regarded the question whether a wage lien arose as controlled by the law of the flag (or, in some cases, the lex loci contractus) and recognized such liens when created by foreign law.[25] Hence, it could be argued that the statute should be construed to allow such foreign liens priority.
 
 
 27
 We think the Act cannot bear such a construction. The Ship Mortgage Act, until amended in 1954, applied only to American vessels. At the time the Act was passed, the only wage liens that might be enforced in an admiralty ship mortgage foreclosure proceeding were those of ordinary seamen.[26] Hence, for the rule contended for to prevail, we would have to conclude that the Foreign Ship Mortgage Act intended to confer rights upon masters of some foreign vessels which had not yet been extended to masters of American vessels and which were not in harmony with American maritime law. Such an intention should appear clearly, but there is nothing in the statute or the legislative history which even remotely suggests such a purpose.[27]
 
 
 28
 Aside from the absence of any indication of such legislative intent, the treatment of masters' wage liens must be viewed in historical context. While American courts recognized such liens when created by foreign law, their priority was controlled by the law of the forum[28] and they were not given the same high priority as those of ordinary seamen.[29] Thus, it would not have been inconsistent for Congress, presumptively aware of the status of foreign masters' liens on the courts, to exclude them from a high priority class.
 
 
 29
 In light of the foregoing considerations, we conclude that the term 'crew,' as used in 953(a)(2), was not intended to include the master of a vessel. Accordingly, even if the Master had valid maritime liens for wages, double wages under 596, and disbursements-- issues we do not reach-- they were subordinate to National's mortgage, as they were not preferred maritime liens.
 
 
 30
 The judgment of the district court is affirmed insofar as it allows the Master's claims for custodia legis and travelling expenses. It is reversed insofar as it allows the Mcster's claims for wages, statutory double wages, and disbursements, and the case is remanded to the district court for the entry of judgment in accordance with this opinion.
 
 
 
 [1]
 274 F.Supp. 324 (D.P.R.1967), rev'd in part on other grounds, 412 F.2d 707 (1st Cir., filed May 28, 1969)
 
 
 [2]
 The Master's claims, allowed by the district court and not questioned as to their amounts, are for (1) wages ($769.99); (2) double wages under 46 U.S.C. 596 ($839.88); (3) travel expenses incurred in attempts to secure funds from the owners before the arrest of the vessel ($150); (4) expenses incurred after the arrest of the vessel ($814.20); and (5) disbursements for sundry expenses of the ship ($8,370.78)
 
 
 [3]
 The wage and travel expense claims were disposed of at 274 F.Supp. 324 (D.P.R.1967). The claim for disbursements was allowed in an unpublished order. Civ. No. 453-67 (D.P.R., filed Oct. 14, 1968). The claims for expenses while the ship was in custodia legis and for statutory double wages were allowed at 293 F.Supp. 425 (D.P.R.1968)
 
 
 [4]
 United States Consol. Seeded Rainsin Co. v. Chaddock & Co., 173 F. 577, 97 C.C.A. 527 (9th Cir. 1909), cert. denied, 215 U.S. 591, 30 S.Ct. 407, 54 L.Ed. 340 (1910); Gramling v. Food Mach. & Chem. Corp., 151 F.Supp. 853 (W.D.S.C.1957)
 
 
 [5]
 Kane v. Roxy Theatres Corp., 63 F.2d 754, 756 (2d Cir.), cert. denied, New York Edison Co. v. Kosch, 289 U.S. 751, 53 S.Ct. 695, 77 L.Ed. 1496 (1933)
 
 
 [6]
 46 U.S.C. 911-984 (1964)
 
 
 [7]
 See generally S.Rep.No.1213, 83d Cong., 2d Sess. (1954); H.R.Rep.No.1662, 83d Cong. 2d Sess. (1954); Hearings on S. 2407 Before the Senate Committee on Interstate and Foreign Commerce, 83d Cong., 2d Sess. (1954); Hearings on H.R. 6276 Before the House Committee on Merchant Marine and Fisheries, 83d Cong., 2d Sess. (1954)
 
 
 [8]
 Brandon v. SS Denton, 302 F.2d 404, 410 (5th Cir. 1962); The Estrada Palma, 8 F.2d 103 (E.D.La.1923); The Oconee, 280 F. 927 (E.D.Va.1922); The Scotia, 35 F. 907 (S.D.N.Y.1888); The Olga, 32 F. 329 (S.D.N.Y.1887); The Graf Klot Trautvetter, 8 F. 833 (D.S.C.1881); Note, Priorities of Maritime Liens, 69 Harv.L.Rev. 525, 526 n. 13 (1956); Note, What Law Governs Maritime Liens, 26 Harv.L.Rev. 356, 358 (1913); see Harrison v. Sterry, 9 U.S. (5 Cranch) 289, 3 L.Ed. 104 (1809)
 
 
 [9]
 The Master does not contend that National's mortgage fails to meet the statutory requirements
 
 
 [10]
 New York Dock Co. v. S.S. Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927)
 
 
 [11]
 See Empressa Nacional 'Elcano' De La Marine Mercante v. M/T Tropicana, 252 F.Supp. 399, 402 (E.D.La.1965), aff'd without consideration of the point sub nom. Tropicana Shipping, S.A. v. Empresa Nacional 'Elcano' de la Marina Mercante, 366 F.2d 729 (5th Cir. 1966); Roy v. M/V Kateri Tek, 238 F.Supp. 813 (E.D.La.1965)
 
 
 [12]
 The reasoning is somewhat elaborate. One who furnishes necessaries to a ship acquires a lien therefor. In this case, those providing the Master with trans-portation and incidents thereto acquired liens, if the services were necessaries. However, it is well established that one who advances money to a ship for the purpose of discharging lien claims inherits the liens discharged, including their rank, by subrogation. Crustacean Trans. Corp. v. Atalanta Trading Corp., 369 F.2d 656, 659-670 (5th Cir. 1966); Pavlis v. Jackson, 131 F.2d 362 (5th Cir. 1942); cert. denied, 318 U.S. 769, 63 S.Ct. 761, 87 L.Ed. 1140 (1943); The Ruth E. Merrill, 286 F. 355 (2d Cir. 1922); The Bergen, 7 F.2d 379 (S.D.Cal.1925); The Ascutney, 278 F. 991 (D.Md.1922), rev'd on other grounds, 289 F. 802 (4th Cir. 1923); The Cimbria, 214 F. 128 (D.N.J.1914); The City of Camden, 147 F. 847 (S.D.Ala.1906); G. Gilmore & C. Black, The Law of Admiralty 9-20, at 519 (1957); Note, Priorities of Maritime Liens, supra n. 9, at 532-33 (1956) (priority rule criticized); see Findley v. Lanasa, 276 F.2d 907 (5th Cir. 1960). The rule is applicable to a master as well as to third parties. The Englewood, 57 F.2d 319 (E.D.N.Y.1932). Therefore, if the services rendered to the Master in his travels were necessaries, they gave rise to maritime liens to which the Master, by advancing payment on behalf of the vessel, was subrogated
 
 
 [13]
 The district court ruled that the Master had authority to subject the vessel to the liens claimed in this case. National does not contest that holding
 
 
 [14]
 See, e.g., The Muskegon, 275 F. 348 (2d Cir. 1921); The Majestic II, 285 F. 91 (S.D.Fla.1922); The Penn, 266 F. 933 (E.D.Pa.1920), aff'd without consideration of the point, 279 F. 212 (3d Cir. 1922); 1 E. Benedict, Admiralty 90 (Knauth 6th ed. 1940)
 
 
 [15]
 Gilmore & Black, supra n. 12, at 543; see also Stern, Hays & Lang, Inc. v. M/V Nili, 407 F.2d 549 (5th Cir. 1969) (services of advertising agency for cruise ship); Colonial Press of Miami, Inc. v. The Allen's Cay, 277 F.2d 540 (5th Cir. 1960) (printing supplies); Allen v. The M/V Contessa, 196 F.Supp. 649 (S.D.Tex.1961) (cigarettes); Walker-Skageth Food Stores v. The Bavois, 43 F.Supp. 109 (S.D.N.Y.1942) (liquor for pleasure yacht); The Artemis, 53 F.2d 672 (S.D.N.Y.1931) (uniforms for yacht crew; taxi fare for conveying provisions to the vessel); In re Burton S.S. Co., 3 F.2d 1015 (D.Mass.1925) (canal tolls where alternate route available); The Susquehanna, 3 F.2d 1014 (D.Mass.1923) (fumigation of passengers' baggage); The Ascutney, supra n. 12 (master's taxi fare)
 
 
 [16]
 See, e.g., Sherman v. Hamilton, 295 F.2d 516 (1st Cir. 1961), cert. denied, 369 U.S. 820, 82 S.Ct. 827, 7 L.Ed.2d 785 (1962); New York Credit Men's Adjustment Bureau, Inc. v. A. Jesse Goldstein & Co., 276 F.2d 886 (2d Cir. 1960); cf. Interstate Natural Gas Co., Inc. v. FPC, 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742 (1947)
 
 
 [17]
 See authorities cited note 7, supra
 
 
 [18]
 This is obviously true of the Master's wage claim, which we assume, without deciding, constitutes a lien against the vessel by virtue of the application of Liberian law. His claim under 46 U.S.C. 596 (1964) is similar, as that section provides that a sum due thereunder 'shall be recoverable as wages in any claim made before the court * * *.' This language has been uniformly held to give rise to a maritime lien of the same rank as the simple wage lien. Gerber v. Spencer, 278 F. 886 (9th Cir. 1922); Peterson v. S.S. Wahcondah, 235 F.Supp. 698 (E.D.La.1964); The Trader, 17 F.2d 623 (E.D.S.C.1926); The Nika, 287 F. 717 (W.D.Wash.1923); The Chas. L. Baylis, 25 F. 862 (S.D.N.Y.1885); Covert v. British Brig Wexford, 3 F. 577 (S.D.N.Y.1880) (British statute with similar language). Finally, the claim for disbursements depends indirectly upon the same question. The balance in favor of the Master depends solely upon his having paid the former master's wages. Although the Master may have a lien for disbursements, see Gilmore & Black, supra n. 12, at 513, such a lien is not a preferred maritime lien and would therefore be subordinate to a preferred mortgage. Hence, if the Master is to have priority on this item, it must be by way of the subrogation theory. Note 12, supra. Since the present Master's payment of that claim gave him the same rights as the former master, his claim for disbursements must be treated as a master's wage lien and its priority turns on whether the former master's claim was a lien 'for wages of the crew of the vessel * * *.' (Alternatively, it might be argued that the Master's claim should be viewed as analogous to an action on an open account. In such an action, the items are not considered independently and the balance constitutes a single, indivisible liability. 1 Am.Jur.2d, Accounts and Accounting 4, 9 (1962). However, if we were to adopt that course, the Master would stand in no better position. At most he would be entitled to a lien for disbursements for the balance and such a lien is not a preferred maritime lien.)
 
 
 [19]
 See 1 Benedict, supra n. 14, at 247
 
 
 [20]
 4 Benedict, supra n. 14, at 282; Gilmore & Black, supra n. 12, at 514
 
 
 [21]
 The John G. Stevens, 170 U.S. 113, 119, 18 S.Ct. 544, 42 L.Ed. 969 (1898)
 
 
 [22]
 Drinkwater v. The Spartan, 7 Fed.Cas. 1085, 1090 (No. 4,085) (D.Me.1828); accord, The Steamboat Orleans v. Phoebus, 36 U.S. (11 Pet.) 175, 179, 9 L.Ed. 677 (1837); Sheppard v. Taylor, 30 U.S. (5 Pet.) 675, 710, 8 L.Ed. 269 (1831) (Story, J.); Walker v. Woolsey, 186 F.2d 920 (5th Cir. 1951); The Maret, 145 F.2d 431 (3d Cir. 1944); Burdine v. Walden, 91 F.2d 321 (5th Cir. 1937); The Grand Turk, 10 Fed.Cas. p. 956 (No. 5,683) (C.C.N.Y.1817); Crain v. American Waterways Corp., 143 F.Supp. 256 (E.D.Pa.1956); The Aguia, 72 F.Supp. 201 (E.D.S.C.1947); The Herbert L. Rawding, 55 F.Supp. 156 (E.D.S.C.1944); The Mariner, 298 F. 108 (D.Mass.1924); The M. Vandercook, 24 F. 472 (D.N.J.1885); 1 Benedict, supra n. 14, 80; Gilmore & Black, supra n. 12, at 512-13; Note, Priorities of Maritime Liens, supra n. 8, at 529
 
 
 [23]
 S.Rep.No.1079, 90th Cong., 2d Sess. (1968)
 
 
 [24]
 46 U.S.C. 600-601, 606-608 (Supp. IV, 1968). The statute, even if retroactive, would not be helpful here, as it applies only to masters of American vessels
 
 
 [25]
 See, e.g., The Chusan, 5 Fed.Cas. 680 (No. 2,717) (C.C.Mass.1843); The City of Atlanta, 17 F.2d 308 (S.D.Ga.1924); The Yarmouth, 1923 A.M.C. 729 (S.D.N.Y.1923); The Woudrichem, 278 F. 568 (E.D.N.Y.1921); The City of Miami, 265 F. 427 (D.Mass.1920); The Kaiser Wilhelm, 230 F. 717 (D.N.J.1916); The Scotia, supra n. 8; The Olga, supra n. 8; Hatton v. The Melita, 11 Fed.Cas. p. 827 (No. 6,218) (D.Md.1880); Griffin, The Federal Maritime Lien Act, 37 Harv.L.Rev. 15, 24-25, 1923 A.M.C. 206, 214 (1923); Note, What Law Governs Maritime Liens, supra n. 8, at 358; but see The Woodland, 30 Fed.Cas. p. 501 (No. 17,977) (C.C.S.D.N.Y.1878), aff'd on other grounds, 104 U.S. (14 Otto) 180, 26 L.Ed. 705 (1881)
 
 
 [26]
 In 1854, the Supreme Court ruled that a ship mortgage was not a maritime contract and was therefore not within the admiralty jurisdiction. Bogart v. The John Jay, 58 U.S. (17 How.) 399, 15 L.Ed. 95 (1854). Therefore, ship mortgages could not be enforced in admiralty and mortgagees did not have rights in rem against the vessel until the enactment of the Ship Mortgage Act. Since that Act applied only to American vessels, the only wage liens enforceable in an admiralty foreclosure proceeding were those created by American law. See note 25, supra
 
 
 [27]
 See generally authorities cited note 7, supra
 
 
 [28]
 Authorities cited note 8, supra
 
 
 [29]
 Burdine v. Walden, supra n. 22; The Hanna Nielsen, 273 F. 171 (2d Cir. 1921); The Estrada Palma, supra n. 8; The Edith, 217 F. 300 (W.D.Wash.1914); The Laurel, 113 F. 373 (D.Wash.1902); Connor, Maritime Lien Priorities: Cross-Currents of Theory, 54 Mich.L.Rev. 777, 800 (1956); see authorities cited note 25, supra